CHARLES KAY BISHOP, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 49939, 49940, 49941, 49942, 49943.    Filed January 31, 1956.

*Carl E. Davison, Esq.*, for the petitioners.
*John H. Welch, Esq.*, for the respondent.

[1] Proceedings of the following petitioners are consolidated herewith: Robert C. Bishop and Charles Kay Bishop Trust, C. M. Bishop, Trustee, Docket No. 49940; Robert C. Bishop, Docket No. 49941; Pendleton Woolen Mills, Docket No. 49942; and C. M. Bishop, Docket No. 49943.

MULRONEY, *Judge:* This consolidated proceeding arises in connection with five petitioners contesting the determination by the Commissioner of deficiencies in income tax, as follows:

| Docket No. | Petitioner | Taxable year | Deficiency |
|---|---|---|---|
| 49939 | Charles Kay Bishop | 1946 | $23,338.13 |
| 49940 | Robert C. Bishop and Charles Kay Bishop Trust, C. M. Bishop, Trustee | 1946 | 23,338.13 |
| 49941 | Robert C. Bishop | 1946 | 23,338.13 |
| 49942 | Pendleton Woolen Mills | 1946 | 6,755.51 |
|  |  | 1947 | 4,297.12 |
| 49943 | C. M. Bishop | 1946 | 32,243.80 |

The petitioner, Pendleton Woolen Mills, was, in the years 1946 and 1947, an Oregon corporation with its principal place of business in Portland, Oregon. Its returns for the taxable years 1946 and 1947 were filed with the collector of internal revenue at Portland, Oregon. C. M. Bishop, Robert C. Bishop, and Charles Kay Bishop are individuals. The returns for C. M. Bishop, as an individual and as trustee for Robert C. Bishop and Charles Kay Bishop Trust, for the calendar year 1946, were filed with the collector of internal revenue at Portland, Oregon.

All of the facts were stipulated and are accordingly so found.

The following is a summary of the stipulation. Pendleton Woolen Mills, hereinafter called Pendleton, is a corporation, existing since 1909, and engaged in the manufacture of woolen products in the vicinity of Pendleton, Oregon, under the "Pendleton" label. All of the stock was at all times owned by members of the Bishop family. In 1946 Roy T. Bishop owned one-third of the stock and his brother C. M. Bishop owned one-third, and controlled the balance as trustee of the estate of R. C. Bishop, a third brother who died in 1927. The beneficiaries of the trust estate were the sons of R. C. Bishop, deceased, Robert C. and Charles Kay Bishop.

During the years 1946 and 1947, the officers and directors of Pendleton were: C. M. Bishop, president; Roy T. Bishop, vice president; and Robert C. Bishop, secretary. Actually C. M. Bishop was the general manager of Pendleton, and Robert was the garment production manager, advertising manager, and labor relations manager. Charles Kay Bishop and Roy T. Bishop did not participate in the day-to-day management of Pendleton.

Beginning in the year 1936, and continuing until the year 1946, a partnership operating under the name of Pendleton Woolen Mills Garment Factory at Portland, Oregon, hereinafter called the Portland partnership, and from 1941 through 1946 a partnership operating

under the name of Pendleton Woolen Mills Plant No. 2, at Los Angeles, California, hereinafter called the Los Angeles partnership, were engaged in the manufacture of woolen sportswear apparel. The said sportswear was marketed under the trade name of "Pendleton" with the same label as that used by Pendleton Woolen Mills in marketing the products manufactured by it, from which it appeared that the products had been manufactured by Pendleton Woolen Mills. The members of the said partnerships were C. M. Bishop, individually as to a one-half interest, and C. M. Bishop, trustee for Robert C. and Charles Kay Bishop Trust, as to the remaining one-half. All of the products manufactured by the two partnerships were sold by the representatives of Pendleton and invoiced and sales price collected by Pendleton, the office force of Pendleton doing much of the paper work of the two partnerships.

Roy T. Bishop, who was a minority stockholder owning one-third of the stock of Pendleton, had no interest in the two partnerships. He became extremely dissatisfied because of these partnership operations, the profits of which were going to the holders of two-thirds of the stock of Pendleton. On September 12, 1945, Roy T. Bishop wrote a letter to C. M. Bishop stating his position as follows:

There is nothing in either the Directors or Stockholders minutes of this Corporation which authorizes or warrants a partnership composed of yourself individually and as trustee for the R. C. Bishop estate, to operate a garment factory under the name of this Corporation. Nor is there anything in the minutes of this Corporation, or was I ever advised or did I ever understand that a garment factory owned by you would be permitted to make a profit through its manufacturing operations with this Corporation.

I have always believed that you were strictly observing the rule that a Director occupied a trust relationship to stockholders and as such a Director would make no personal profit in your dealings with this Corporation. It would appear from your letter that the Pendleton Woolen Mills Garment Factory has made a substantial profit, which has inured to your personal benefit, from its dealings with this Corporation. I am unwilling to countenance this arrangement and hereby protest the use of the Pendleton name in connection with said garment factory and any private or personal profits inuring to your benefit through your dealings on behalf of this Corporation with said garment factory.

The same situation relates with reference to Pendleton Woolen Mills Plant No. 2, and my position as to it is similar.

Paragraph 21 of the stipulation states:

As a result of the claim of Roy T. Bishop and discussions between him and the other directors of Pendleton Woolen Mills, it was agreed on December 21, 1945 that Abe Eugene Rosenberg and V. V. Pendergrass should be employed by the corporation to advise the corporation of its rights, particularly the rights as between Pendleton Woolen Mills and C. M. Bishop, individually and as trustee, with reference to the income of the Portland Partnership and the Los Angeles Partnership.

During the year 1946 Abe Eugene Rosenberg and V. V. Pendergrass worked out a settlement of the matters in controversy which culminated

in a written agreement dated December 31, 1946, signed by C. M. Bishop, individually, and C. M. Bishop, trustee, Roy T. Bishop, and Robert C. Bishop. The stipulation outlines much of the work done by the attorneys and states, in part:

Abe Eugene Rosenberg and V. V. Pendergrass had advised the directors of Pendleton Woolen Mills that in their opinion the income of the said partnerships should belong to Pendleton Woolen Mills and that the matters in controversy should be settled and disposed of in the manner as set forth in said agreement of December 31, 1946.

The attorneys were paid $7,500 each by Pendleton, which respondent admits were reasonable charges for their services. Pendleton deducted these amounts in its corporate income tax return for 1946. The respondent contends that the services of the attorneys were for the benefit of the individual stockholders and members of the Bishop family and therefore not deductible by the corporation as an ordinary and necessary business expense.

The agreement of December 31, 1946, settled and disposed of numerous problems, including the existence and operation of the two partnerships. This problem was settled in the agreement by the transfer of the assets of both partnerships to Pendleton at book value, together with all of the income earned by the partnerships since January 1, 1946, the partnership businesses to be thereafter operated as departments or branches of Pendleton. A board of directors' meeting of Pendleton on December 31, 1946, shows the adoption of minutes approving the terms of the December 31, 1946, agreement, and on the same date the transfers of the assets and 1946 income of the two partnerships to Pendleton were made. Neither partnership filed a partnership return for 1946 and Pendleton reported on its 1946 tax return the income transferred to it from the two partnerships.

### Issue 1.

The first question is as to the deduction by Pendleton of the $15,000 paid by it to the attorneys. The respondent's position is that the services rendered by the attorneys were for the benefit of the individual stockholders and members of the Bishop family and therefore not deductible by the corporation as an ordinary and necessary business expense. But the stipulation states the attorneys were employed "to advise the corporation of its rights, [and] particularly the rights as between Pendleton Woolen Mills and C. M. Bishop, individually and as trustee, with reference to the income of the Portland Partnership and the Los Angeles Partnership." It goes on to state that the attorneys did advise the directors of Pendleton that "the income of the said partnerships should belong to Pendleton." This is a clear statement of hiring counsel with respect to an asserted claim that often is

the subject of a so-called stockholder's derivative action. Here the advice of counsel was that such claim was valid. If it had been necessary to litigate the claim for this partnership income the suit would have been brought on behalf of the corporation. A stockholder has no personal right of action for wrongs committed against the corporation by its officers and directors. He may sue them in a derivative action on behalf of the corporation to recover for the corporation losses resulting from their fraud, mismanagement, or other breach of trust. Where the result of a stockholder's derivative action inures to the benefit of the stockholders generally, the courts, as a rule, allow as part of the costs the fees for the attorney for the parties instigating the action against the corporation. *Solimine* v. *Hollander*, 19 A. 2d 344 (N. J.); *State* v. *Bechtel*, 56 N. W. 2d 173 (Ia.); *Coeur D'Alenes Lead Co.* v. *Kingsbury*, 59 Idaho 627, 85 P. 2d 691; *May* v. *Midwest Refining Co.*, 121 F. 2d 431.

In the instant case the claims were settled. A substantial benefit for the corporation was secured by the settlement agreement that gave the corporation the fruits of the allegedly improper gains by some of its officers, as well as the business formerly carried on by the two partnerships. The allowance of attorneys' fees for services rendered stockholders in a successful stockholders' derivative action is based on the theory that the corporation has been benefited and should pay the reasonable value of the services rendered it. The same theory would support payment of attorneys' fees by the corporation as an ordinary and necessary business expense when the services performed were in settlement of claims of a derivative nature.

The stipulation details much of the services rendered by the attorneys, such as conferences with directors, attendance at stockholders' and directors' meetings, directions as to proper book entries, preparation of minutes of meetings, and the preparation of the contract, etc. These are, to a large extent, steps in the mechanics of the settlement that captured the income of the partnerships for the corporation. It is true the contract of December 31, 1946, went somewhat beyond settlement of the corporation's claim for the partnerships' income in that it provided for cumulative voting for directors, determined officers' salaries, and made some provision for the method of operation of a partially owned subsidiary of Pendleton. But these were not unrelated subjects to the main charge that some of the officers were conducting the business of Pendleton in such a manner as to reap a personal profit at the expense of Pendleton. Actually the contract merely contained provisions which, if performed, would forestall future claims which could be the subject of a stockholder's derivative suit. We hold the $15,000 paid to the attorneys by Pendleton, which respondent admits was reasonable in amount, properly deductible from Pendleton's 1946 gross income.

*Issue 2.*

The second proposition urged by the respondent is that the 1946 income of the two partnerships is taxable to the partners, despite the transfer of this income to the corporation on the last day of 1946.

This income was included by Pendleton in its corporation income tax return for 1946. It can be admitted that the partnership received the income during the year 1946, and it is true the partnership income normally accrues to the partners whether distributed or not. The most one can say is that the partners received the partnership income under a claim of right to it. But the record shows there was a controversy with Pendleton as to that right. The attorneys were hired in December of 1945 to advise Pendleton with reference to the partnership income. It is undisputed that a real controversy existed as to this partnership income. It is the partners' contention that they merely relinquished their claim of right to the partnership income for 1946, in the year it was received, by the December 31, 1946, agreement.

We recently considered the application of the claim of right doctrine in *Michael Phillips*, 25 T. C. 767. Briefly, the petitioners assert that the directors of a corporation cannot retain income gained personally from a deal with the assets of the corporation, citing *Enyart* v. *Merrick*, 148 Ore. 321, 34 P. 2d 629, and that under the facts here Pendleton was *entitled* to this partnership income. The next step in petitioner's argument is that where the alleged income is restored to the rightful owner in the same taxable year it is received, then the income is not taxable to the original recipient.

The petitioners' contention is supported by authorities. The "claim of right" doctrine had its origin in *North American Oil Consolidated* v. *Burnet*, 286 U. S. 417. In general, it charges the recipient with the receipt of income when he asserts a claim it is his even though his claim later proves to be invalid. There is no need to go into a general discussion of the claim of right doctrine for actually here the question is as to the tax consequences when in the year of receipt the claim of right is renounced and the income repaid to its rightful owner. The applicable rule was recently stated in the following quotation from *United States* v. *Merrill*, 211 F. 2d 297:

We are not aware that the rule has ever been applied where, as here, in the same year that the funds are mistakenly received, the taxpayer discovers and admits the mistake, renounces his claim to the funds, and recognizes his obligation to repay them. Cf. *Carey Van Fleet*, 2 B. T. A. 825; *Curran Realty Co.* v. *Commissioner*, 15 T. C. 341. We think there is no warrant for extending the harsh claim of right doctrine to such a situation. In such case the Internal Revenue Bureau is not faced with the problem of deciding the merits of the claim to the funds received, for the question has been resolved by the interested parties. * * *

We are convinced the doctrine of the *Merrill* case should be applied. Respondent states in his brief that he does not concede that the part-

nership income belonged to Pendleton because of the manner whereby it was derived. But there was certainly a controversy over whether such income did or did not belong to Pendleton and the parties to the controversy resolved their claims in favor of Pendleton. In effect, the partners who received the income lost their claim to it in the year of receipt. Respondent seems to recognize the force of the *Merrill* case as authority if it is applicable but suggests we should follow the earlier case of *Estate of Lloyd E. Crellin*, 17 T. C. 781, affd. 203 F. 2d 812, certiorari denied 346 U. S. 873. There the stockholders of a corporation made a voluntary return of a dividend to the corporation in order to decrease their own taxable income. The opinion is based on the ground that the repayment of the dividend was voluntary. Here there was no voluntary repayment but instead the partners recognized the superior claim of Pendleton by the December 31, 1946, agreement. We see no conflict between the two opinions. We hold under the facts of this case the income of the partnerships for 1946 was not taxable to the partners and that it was properly included in the income tax return of Pendleton for the year 1946.

Our conclusions on the above two points decide the case. Two other points are argued but it is admitted they are not reached if the petitioners prevail as above. The briefs indicate some recomputation might be necessary in some of the consolidated cases to dispose of certain issues which have been agreed upon, so decisions will be entered, in accordance with this opinion, in favor of the petitioners.

*Decisions will be entered under Rule 50.*