ROYAL COTTON MILL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 29689.   Filed January 31, 1958.

762

*J. Gilmer Korner, Jr., Esq., Stanley Worth, Esq.*, and *A. T. Allen, C. P. A.*, for the petitioner.

*Harold Weinstock, Esq.*, for the respondent.

766

768

782

OPINION.

BLACK, *Judge:* The issues will be discussed in the same order as the findings of fact relating to them.

*Issue 1.  Section 722 Relief.*

Petitioner seeks excess profits tax relief, relying on section 722 (a) and (b) (4). The first question is whether the petitioner has established the existence of a qualifying factor. It relies on a change in character of its business, specifically a commitment. The qualifying factor relied upon is defined in section 722 (b) (4), as follows:

Any change in the capacity for production or operation of the business consummated during any taxable year ending after December 31, 1939, as a result of a course of action to which the taxpayer was committed prior to January 1, 1940 * * *

Such change, if it occurred, is deemed to have been made on December 31, 1939.

Regulations 112, section 35.722–3 (d), provide, in part, as follows:

Such a commitment may be proved by a contract for the construction, purchase, or other acquisition of facilities resulting in such change, by the expenditure of money in the commencement of the desired change, by the institution of legal action looking toward such change, or by any other change in position unequivocally establishing the intent to make the change and commitment to a course of action leading to such change. * * *

Petitioner contends that soon after its inception it realized that it could not hope to operate successfully with the same equipment and manufacturing the same products; that it made investigations to determine what sort of changes were necessary in order to put it on a profitable basis, employing an experienced man specifically for that purpose; that in 1939 it adopted a specific plan involving the purchase of a substantial amount of new machinery, the discarding of certain old machinery, the manufacturing of a different product, and the doubling of its productive capacity; that because of financial difficulties it could not carry out the plan in 1939; and that in 1941–1942 when its financial problems were solved it carried out the plan.

For the reasons hereinafter stated, we do not think the record sustains the petitioner's position. The conclusion that early in the base period petitioner realized that its present operations could not be successful is not supported. Soon after it commenced operations it initiated a policy of continuous improvement of its physical plant. During the period 1934 to 1938, it added $66,000 to its machinery account, $11,000 to its building account, and expended $53,000 on maintenance repairs in excess of normal expenditures on these items. The expenditures contemplated the improvement of the *then existing operations;* not a *change in operation* as was consummated in 1942.

It is true that petitioner hired Smart with an eye toward making its operation profitable and if he was successful, to compensate him in the future with some sort of profit-sharing plan. Smart, who was not a witness at the hearing, appears to have been thoroughly qualified for his work and a person who was continually devising plans to make petitioner's operation successful. There is nothing, however, that indicates that he was hired in conjunction with the alleged realization that a complete change of operation was necessary.

Smart's memorandum dated October 13, 1939, and Johnston's reply dated November 10, 1939, which, judging from petitioner's argument in its brief, purportedly embrace the "plan" and its adoption by petitioner, if considered *in vacuo* might be considered to be a course of action to which the taxpayer was committed prior to January 1, 1940. However, when viewed in relation to other circumstances it seems clear that petitioner made no change in position and was not committed to that plan within the meaning of section 722 (b) (4) and the Treasury regulations quoted above. In 1941, shortly before the order for the new machinery was placed with Saco-Lowell, Smart prepared five separate and distinct plans concerning petitioner's operation. Undoubtedly some of them were originally devised and discussed during the base period and did not constitute new plans. It is significant, however, that Smart brought the information in these plans up to date. If petitioner was committed to the October 13, 1939, plan there would have been, it seems to us, no need to relate the other plans to 1941 conditions.

The petitioner relies heavily on *Studio Theatre Inc.*, 18 T. C. 548 (1952). We think that case is distinguishable on its facts and is not controlling here.

The record as a whole, we think, does not show that the petitioner made any "change in position unequivocally establishing the intent to make the change and commitment to a course of action leading to such change." Accordingly, we hold that petitioner has failed to establish the existence of a qualifying factor. The lack of a qualifying factor makes it unnecessary to decide whether the petitioner's ABPNI is an inadequate standard of normal earnings and whether the petitioner has

established what would be a fair and just amount representing normal earnings to be used as a CABPNI.

We sustain the Commissioner in his denial of petitioner's claim for relief under section 722.

### Issue 2. Selling Commissions.

This issue involves the question of whether certain selling commissions in the amounts of $54,236.90 and $59,111.96 which were paid or incurred in the fiscal years 1944 and 1945, respectively, are deductible under section 23 (a) (1) (A) as ordinary and necessary expenses of carrying on petitioner's business.

Prior to the years in question petitioner, in accord with the industry's custom, had always sold its product through a sales agent and also factored its accounts receivable. The rate for both services combined was usually 5 per cent of sales. During the war there was a great demand for cotton products; customers with Government priorities were clamoring for yarn; and it became increasingly easy for mills to sell their products and, in some instances, they could do so without the services of a sales agent. Some mills disposed of their sales agent. Many mills which retained their sales agents paid a 2 per cent commission while others paid 3 per cent or more.

Petitioner became dissatisfied with its agent, Turner-Halsey, to which it was paying 4 per cent for selling and factoring because Turner-Halsey was selling petitioner's production to a few large customers. Petitioner was especially concerned in regard to the postwar period. Most of the mills which were purchasing yarn from petitioner could, under normal circumstances, spin a sufficient quantity to meet their own needs. Petitioner was seeking to distribute its products to a greater number of small customers so it would not be dependent on the purchases of a few large customers when the war ceased.

In August 1943, petitioner terminated its contract with Turner-Halsey and entered into a contract with a partnership composed of Johnston, petitioner's salaried president who with other members of his family owned 480 of the petitioner's 660 shares of common stock, and Smart, petitioner's general manager, which provided that the partnership would be petitioner's exclusive selling agent for a 3 per cent commission. Johnston and Smart were equal partners. The partnership operated out of office space in petitioner's old storehouse in Wake Forest and had no branch offices. In the first few months, however, the partnership substantially increased the number of petitioner's customers.

In March 1944, Johnston and other members of his family sold 349 of their shares of petitioner's common stock to Smart and 10 shares

to two other persons. Johnston was advised that certain minority shareholders did not regard Johnston's acting as both president of petitioner and its sales agent as proper. Thereafter, in July 1944, Johnston and other members of his family resigned their positions as officers and directors of petitioner and Smart was elected president; the contract with Johnston & Smart was terminated; and a new contract, with the same terms, was entered into with Johnston & Co., a partnership composed of Johnston, who with other members of his family now owned 121 shares of petitioner, and Milliken, who owned no stock in petitioner. Johnston had an 85 per cent interest and Milliken had a 15 per cent interest in the partnership. This partnership acted as petitioner's exclusive sales agent from July 5, 1944, to May 31, 1945.

About August 1, 1944, petitioner received a lengthy protest from Smith and certain members of his family alleging improper conduct on the part of petitioner and its officers, Johnston and Smart particularly, regarding the petitioner's selling arrangements. Petitioner considered the objections in light of a survey made by a third party of petitioner's management and sales policies. The demands of the protesters were rejected. In the meantime, Smith and the other members of his family who were stockholders brought suit against petitioner, Johnston, Smart, and the two selling partnerships. The suit was settled on May 31, 1945. A consent decree was entered providing that no party should recover from any other party. As part of the settlement the majority shareholders (Johnston and members of his family, Smart, and others) sold their 480 shares of petitioner's common stock to the minority shareholders (Smith and members of his family) and to those whom the minority brought in (Jordan interests). The stock was sold for $500 per share; however, Smith received a discount of $32,500 on the shares which he purchased. The discount was absorbed by Smart.

The respondent does not contend that selling commissions during the war period are objectionable per se. He does contend they are not deductible in the instant case because they were paid to selling agents who were connected with the petitioner in other ways. During the periods when they acted as selling agents and shared in the commissions, Smart was general manager for 11 months and majority shareholder for 4 months; Johnston was president for 11 months and a continuous shareholder; and Milliken, the other partner in Johnston & Co., never had any direct connection with petitioner.

We think the respondent's disallowance of these commissions was in error. It should be pointed out at this juncture that our task is not to decide whether the payments in question were ethical in character. Our function is to decide whether they are deductible as ordinary and necessary business expenses under section 23 (a) (1) (A). See

*Lilly* v. *Commissioner*, 343 U. S. 90 (1952). There is no question but that the partnerships were separate and distinct entities. The fact that Johnston visited customers in his capacity as president does not mean that he did not perform other services as a salesman which he did not customarily perform in his capacity as president. If this were not so there would be no justification for paying commissions to other sales agents such as Turner-Halsey, which the respondent concedes are proper. Also, Johnston acted in the dual capacity as president of the corporation and salesman of the partnership for only 11 months. Although the partnerships did not have service facilities comparable to some of the other larger sales agents, the record shows that the partnerships did act as petitioner's exclusive sales agent and they performed their functions in a manner which so far as the record shows was satisfactory. Considering these circumstances, respondent's reliance on *Gregory* v. *Helvering*, 293 U. S. 465 (1935), is misplaced.

The 3 per cent rate paid, although in excess of the 2 per cent rate paid by some mills during this period, was the same as or less than the rate paid by other mills and cannot be considered, in the light of the evidence, unreasonable in amount. See *J. T. Flagg Knitting Co.*, 12 T. C. 394 (1949).

Also, it seems clear that these commissions were not disbursements of dividends to stockholders as respondent contends. They were not paid to stockholders in proportion to their stockholdings. The facts, we think, establish that they were not intended as dividends but were intended to be what they purported to be, namely, the payment of commissions for services performed.

Upon consideration of all the evidence, it is our conclusion that respondent erred in disallowing the sales commissions in the fiscal years 1944 and 1945. We think the record establishes that the commissions were actually incurred and paid for services performed for petitioner and were ordinary and necessary expenses paid or incurred in carrying on the petitioner's business.

### *Issue 3. Accrual of State Income Taxes.*

Petitioner is an accrual basis taxpayer.

Respondent, in his notice of deficiency, increased petitioner's net income for the fiscal years 1944 and 1945 by disallowing certain claimed deductions for selling commissions. (See Issue 2, *supra*.) As a result of this increase in net income respondent allowed additional State income taxes for the fiscal years 1944 and 1945 as proper accruals and deductions. Based on the Commissioner's determination the State of North Carolina has assessed these additional taxes but has withheld collection until a final determination by the Federal Government. Re-

spondent, in an amended answer, asserts that he erred in allowing the additional State income taxes. He contends that they did not accrue in the years involved (fiscal years 1944 and 1945) since petitioner is contesting the selling commissions disallowance and in effect is contesting the additional State income taxes. In other words, the taxes in question were and still are contingent.

Obviously, the respondent is correct in asserting that he erred in allowing the additional State income taxes that were based on improper increases in income, such as the disallowance of the selling commissions. See opinion, Issue 2, *supra*. *Curran Realty Co.*, 15 T. C. 341, 344 (1950). We do not understand that the petitioner objects to our holding for the respondent on this issue in the event he prevailed on Issue 2, *supra*.

Accordingly, we hold for the respondent on this issue.

### *Issue 4. Litigation Expenses.*

Petitioner, on its 1945 return, deducted $42,982.08 as litigation expenses incurred in connection with the stockholders' suit. (See Issue 2, *supra*.) The respondent, in an amended answer, asserts that items representing $22,000 of that amount, comprising payments of $10,000 to the law firm of Smith, Leach & Anderson, $10,000 to Jordan, and $2,000 to the law firm of Fuller, Reade, Umstead & Fuller, are not ordinary and necessary business expenses incurred in trade or business under section 23 (a) (1) (A) and not deductible by petitioner. Respondent further alleges that he erred in allowing this $22,000 as a deduction in his determination of the deficiency for the fiscal year 1945 and prays for an increased deficiency for that year.

The petitioner paid its attorneys of record in the suit $8,188.48 and paid other incidental expenses connected with the litigation. It paid the attorneys of record for the plaintiffs (Smith and members of his family) $12,617.85 pursuant to the mandate of the consent judgment which recited that plaintiffs' attorneys of record rendered valuable services for the benefit of petitioner. The consent judgment provided that petitioner was to be relieved of any further obligation to compensate its counsel who had appeared for it in the case. The above-mentioned amounts described in this paragraph were deducted by the petitioner and are not questioned by respondent.

Prior to the commencement of the lawsuit Smith, who at this time was not an officer or director of petitioner, requested Jordan to appraise petitioner's property. Jordan, who was qualified to make such appraisal, did so. Jordan's only connection with the lawsuit was the submission of two affidavits, one of which dealt with the appraisal.

After the settlement of the lawsuit Smith and members of his family acquired additional shares of petitioner's common stock to bring

their holdings to 50 per cent of such shares. Jordan, his wife, and a company with which he was connected acquired the other 50 per cent. Smith and Jordan were elected officers and directors of petitioner. At a meeting of petitioner's shareholders Smith stated that his law firm, Smith, Leach & Anderson, and Jordan had rendered valuable services for petitioner in connection with the lawsuit. The stockholders voted to substantially compensate them for those services. Petitioner paid Smith, Leach & Anderson $10,000 and Jordan $10,000.

Petitioner also paid $2,000 to Fuller, Reade, Umstead & Fuller, as attorneys of record for defendant Smart, petitioner's president at the time of the suit.

The determination of whether the items involved are ordinary and necessary business expenses is essentially one of fact and the principal question here is whether the services, if any, performed by the recipient of the fees were for the benefit of the petitioner or for the individual stockholder. Cf. *Charles Kay Bishop*, 25 T. C. 969, 972–973 (1956).

The respondent, who admittedly has the burden of proof on this issue, see Rule 32, Tax Court Rules of Practice (Jan. 15, 1957), takes the position that—

Inasmuch as the benefits to petitioner in connection with the litigation were secured by its own counsel and according to the consent judgment by Messrs. Douglass and Douglass and Mr. W. T. Joyner, [plaintiffs' counsel of record] the only possible conclusion is that the remaining legal expenses at issue herein, were incurred strictly for the benefit of the individual stockholders concerned, and are therefore not deductible.

Petitioner contends that the respondent has not shown, with the exception of Jordan's services, what services were or were not rendered; that he has failed to show that the Jordan fee was unreasonable; that there is no showing that the services were not for the benefit of petitioner; and that therefore the respondent has not maintained his burden of proof.

We think the inference reasonably to be drawn from all the facts and circumstances supports the respondent's position. The recitations in the consent judgment that petitioner should pay the fees of plaintiffs' attorneys of record for valuable services rendered to petitioner and that petitioner should be relieved of any further obligation to compensate its counsel in the case indicate the extent of the services of the various counsel which were of benefit to petitioner. On the other hand, Smith's statement at the stockholders' meeting, after he and Jordan had obtained control, that his own law firm and Jordon performed valuable services for petitioner is made questionable by the close relation between those in control of petitioner and those who were the recipients of the fees. Also, it is difficult to see how Smart's attorney, who apparently represented him in regard to the withholding

of his salary, could have performed any service for the benefit of petitioner.

Under these circumstances we think that respondent has at least established a prima facie case. In our view petitioner has not rebutted it. Accordingly, we hold that the fees in question are not ordinary and necessary expenses incurred in petitioner's trade or business.

Reviewed by the Special Division as to the section 722 issue.

*Decision will be entered under Rule 50.*