KINGSFORD COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 88648.    Filed February 24, 1964.

*Joseph H. Fink*, *Manning K. Leiter*, and *Joseph P. Antonow*, for the petitioner.

*Julian R. Ettelson* and *Robert B. Pearce*, for the respondent.

OPINION

The first question for our consideration is whether the purchase price of the property was $1,522,000 as petitioner contends or was $1,253,280 as respondent contends with $268,720 representing interest on deferred payments. The question must turn upon what was the actual agreement of the parties. Was it an agreement for Wisconsin to pay Kingsford so much as purchase price and the balance as interest? This must be determined from all of the evidence, documentary and otherwise. The evidence as a whole is that the amount stated in the contract is all principal, not the aggregate of principal and interest.

The final purchase price agreed upon consisted of a $100,000 cash payment, plus monthly payments over the 12-year period at the rate of 3.75 mills per kilowatt-hour of plant output, but not less than the sum payable at this rate for an average annual output of 31,600,000 kw.-hr., or a total minimum purchase price of $1,522,000. The provisions for a $100,000 cash payment and for a minimum price based on an average of 31,600,000 kw.-hr. annual output multiplied by a specific rate per kilowatt-hour, first appeared in Wisconsin's offer of November 12, 1951. All further negotiations were limited to the question of how many mills Wisconsin would pay for each kilowatt-hour generated by the plant, except for Kingsford's counteroffer of March 26, 1952, to sell the plant for $2 million cash.

Wisconsin's offer of November 12, 1951, provided a kilowatt-hour rate of 3⅛ mills, resulting in a total minimum price of $1,300,800. In letters dated October 21, 1952, and November 11, 1952, Fenton requested that the rate be raised to 3.3 mills, in the first letter, and

then to 4 mills in the second letter. Fenton's letters stated that the increase would give them interest on the balance due of the purchase price. In a letter dated December 1, 1952, offering an increase in the kilowatt-hour rate to 3.5833 mills, giving a minimum purchase price of $1,458,787, Van Derzee stated this increase was a "modification upwards" from the previous offer, and also requested additional property be included in the sale.

When Fenton referred to "interest" he was contemplating the present worth of the future payments since Kingsford wanted to borrow an amount of not less than $1,300,000 by pledging the contract as security. Fenton was attempting to value the deferred payments on the purchase price in terms of present worth.

The last development in the negotiations over the purchase price occurred when Wisconsin raised the kilowatt-hour rate from 3.5833 mills to 3.75 mills, thereby increasing the minimum purchase price from $1,458,787 to $1,522,000.

The fact that Kingsford would have sold the plant for a cash price of $1,300,000 does not mean that the difference between that figure and the minimum purchase price of $1,522,000 represented interest. Often a seller will grant a reduction from a stated purchase price for immediate cash payment. The sale of property for cash is quite different from a sale upon a deferred payment plan and the fact that the deferred payment sales price is greater than the cash sale price does not make interest of the difference. *Elliott Paint & Varnish Co.*, 44 B.T.A. 241, 247 (1941) ; *Anderson & Co.*, 6 B.T.A. 713, 717 (1927).

We have refused to consider a portion of the purchase price as constituting interest where the agreement of the parties was for a price without interest. *Clay B. Brown*, 325 F. 2d 313 (C.A. 9, 1962), affirming 37 T.C. 461, 488 (1961). See also *Pretzer* v. *United States*, —— F. Supp, —— (1961) (not reported). Where we have found interest it was because the agreement between the parties contemplated a payment in the nature of interest. *Judson Mills*, 11 T.C. 25, 33 (1948), acq. 1949–1 C.B. 2; *Hudson-Duncan & Co.*, 36 B.T.A. 554, 557 (1937), acq. 1938–1 C.B. 5.

In *Elliott Paint & Varnish Co.*, *supra*, the purchaser originally offered $27,500 in cash for a piece of property. The seller refused the offer preferring a deferred payment plan. The final purchase price of $40,000 was agreed upon after a computation had been made for the seller showing that $27,500 plus interest thereon at 5 percent per annum for 10 years would total $41,250. This or a similar computation was discussed by the parties in arriving at the purchase price of $40,000. The Court rejected the assertion that part of each payment constituted interest.

The discussions between Van Derzee and representatives of Kingsford about the interest rate a third party might charge for loaning

money on the contract did not constitute an agreement, as asserted by respondent, whereby Wisconsin would pay interest to Kingsford at the rate Kingsford was charged by the third party lender.

Respondent claims that the fact that the payments due from Kingsford to First Wisconsin were identical with the payments due from Wisconsin to Kingsford was not a mere coincidence and in essence was the reason why the alleged interest rate charged by Kingsford to Wisconsin is necessarily the same as the interest rate charged by the bank to Kingsford. Respondent further contends that the execution of the contract and its being pledged with a bank were in effect simultaneous. We agree this is no mere coincidence. Kingsford all along intended to either discount the note or pledge it to secure a loan. All that was done was to take the payments that Wisconsin was to pay Kingsford and determine, at the agreed upon interest rate between Kingsford and the bank, what principal amount they would equal assuming a 12-year loan. It was merely working backwards; first, the payment was determined, then the interest rate agreed upon, and finally, working with the first two, the principal amount of the loan was reached. However, this in no way shows that Kingsford charged Wisconsin the same rate of interest or any other rate of interest.

In addition, Van Derzee told Kingsford in his letter of December 1, 1952, that Wisconsin would not pay interest in addition to the stated purchase price, and that if Kingsford felt entitled to interest payments it was "at liberty to assume that whatever part you wished was principal and the balance interest."

In *Judson Mills* and *Hudson-Duncan & Co.*, both *supra*, a definitely ascertainable amount of interest could be computed from discussions or exchanges of documents during the negotiations where interest had been worked out and agreed to by the parties. No such document or agreement exists here.

A mere intent to pay some indefinite amount as interest must be disregarded, assuming it could be shown to exist, because interest must be susceptible of computation pursuant to the agreement of the parties. *Kena, Inc.*, 44 B.T.A. 217, 221 (1941). It follows, therefore, that the phrase in the contract "including both principal and interest on deferred payments" must either be construed as intending only to eliminate interest or it must be disregarded as being indefinite because the parties never agreed on how interest was to be computed.

Furthermore, if the true principal was $1,253,780 as claimed, the interest should stop after such principal amount is repaid even if this occurs several years before the 12-year contract term expires due to a high kilowatt-hour output. However, the contract under consideration allows no reduction from the minimum purchase price of $1,522,000 for an acceleration of payment. The contract also provided

that upon any default by Wisconsin, the entire remaining balance of the minimum purchase price of $1,522,000 may be accelerated at the seller's option.

We are unable to find any probative warrant or rational basis for the respondent's assertion that the interest rate the bank charged Kingsford is the agreed upon rate of interest that Kingsford was to charge Wisconsin. We think it unequivocally appears from the circumstances underlying the parties' dealings that $1,522,000 constituted principal and nothing else.

The second issue involves the deductibility of organization expenses by Kingsford on its final tax return for the period ended September 30, 1957. In the notice of deficiency the sole ground asserted by respondent for the disallowance of the deduction is that "the merger of Kingsford Chemical Company with another company as of July 1, 1957, did not constitute a complete extinction of the company." It appears that respondent, in determining there was a merger, relies on the two footnotes in the tax return which refer to the transaction as merger.

In cases involving the deductibility of organization expenses a distinction has been made between instances where there has been an ordinary liquidation followed by a surrender of the corporate charter and dissolution and instances where there has been a statutory merger or consolidation. *Malta Temple Association*, 16 B.T.A. 409 (1929); *Pacific Coast Biscuit Co.*, 32 B.T.A. 39 (1935); *Citizens Trust Co.*, 20 B.T.A. 392 (1930). In the former a loss deduction has been allowed on the theory that when complete liquidation and dissolution occurred a capital asset acquired at the time of organization (the corporate franchise) was lost. In the latter no loss deduction has been allowed because the surviving or merged corporation continues to receive the benefit of the organization expenditures.

In order for there to be a statutory merger, the applicable State law dealing with corporate mergers must be adhered to. In the instant case, the record is completely void of showing any attempt to comply with the State law [2] on corporate mergers.

The only evidence as to what transpired are the copies of the Statement on Reorganization and the Plan of Reorganization attached to the tax return. Paragraph 3 of the plan reads as follows:

3. As soon as practicable after Kingsford [Kingsford Chemical Co.] shall have acquired the stock of Fox [Kingsford Co., the present petitioner] as described in Paragraph 2 above, Kingsford shall distribute the Fox Stock so received. Such distribution shall be as of the record date established therefor by the Board of Directors of Kingsford. As soon as practicable after the completion of distribution provided for in this paragraph, Kingsford shall withdraw

---

[2] Ill. Ann. Stat. ch. 32, sec. 157.69a (Smith-Hurd 1954); Del. Code Ann. tit. 8, sec. 252.

from all states in which it is qualified to do business and shall be formally dissolved.

It is our opinion that Kingsford liquidated and dissolved and that none of its corporate attributes, rights, privileges, powers, or franchises passed to or continued in petitioner. Only Kingsford's assets went to petitioner in exchange for stock of petitioner. We hold, therefore, that the organization expenses in controversy were a proper deduction on the final tax return of Kingsford. *Pacific Coast Biscuit Co., supra.*

The remaining issue for our decision is the deductibility of certain accounting expenses in the final taxable period of Kingsford. For the purpose of preparing a consolidated statement of petitioner and subsidiaries as of June 30, 1957, an audit of Kingsford's books and records was necessary. It is now claimed that expenses in the amount of $3,905.67 were incurred by Kingsford because of this audit, and are allowable deductions on Kingsford's final tax return.

It is petitioner's position that some of the services required for the preparation of the consolidated financial statements were similar to the services previously performed in the preparation of yearend audits of Kingsford. Petitioner further alleges that since the services are similar to those that would be required had Kingsford remained in existence and a yearend audit been made, the cost of the services actually performed should be deductible by Kingsford on its final return.

Respondent claims these services were performed at the request of petitioner, not at the request of Kingsford. The statement for these services was submitted to and paid for by petitioner. The examination and accounting services concerned the preparation of a financial report to the shareholders of petitioner and petitioner and its shareholders received the benefit of the accounting services.

Expenditures for accounting services are deductible when they are considered to be ordinary and necessary and result from the business of the one claiming the deduction. Cf. *Alabama-Georgia Syrup Co.*, 36 T.C. 747 (1961); *Arc Realty Co.*, 34 T.C. 484 (1960), affirmed in part and reversed in part without discussion of this point, 295 F. 2d 98 (C.A. 8, 1961); *Charles Kay Bishop*, 25 T.C. 969 (1956).

In the present case there is no showing that these services were necessary to the business of Kingsford Chemical. It seems apparent that the accounting costs arose in furtherance of petitioner's business, not that of Kingsford Chemical. In any event, petitioner, bearing the burden of proof, has not established the contrary. The results of the audit were used in the preparation of petitioner's financial statement and petitioner received the benefits of the audit. Petitioner solicited the services and paid for them.

There has been no evidence from which the Court may conclude that Kingsford is entitled to the claimed accounting expense deduction. Accordingly, the respondent's determination as to this item must be sustained.

*Decision will be entered under Rule 50.*