*Decision will be entered under Rule 50.*

ESTATE OF BETTY BERRY, DECEASED, LOUIS BERRY, EXECUTOR, LOUIS BERRY, SURVIVING SPOUSE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

L.C.G. TRUST NO. 2, A. R. GLANCY, JR., SUCCESSOR TRUSTEE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 89806, 89963. Filed February 25, 1965.

---

724

*Frank W. Donovan* and *Charles D. Savage*, for the petitioners.
*Ronald S. Supena*, for the respondent.

BRUCE, *Judge:* Respondent, in his statutory notice of deficiency dated August 29, 1960, determined deficiencies in the income taxes of the petitioners for the years and in the amounts hereinafter set forth. By amendment to his answer filed in each of these proceedings, on April 8, 1964, in accordance with the provisions of section 6214(a) of the Internal Revenue Code of 1954, respondent claimed additional deficiencies for 2 of the 3 taxable years involved in each proceeding, based upon the opinion of this Court in *Raleigh Properties, Inc.*, T.C. Memo. 1962-150. The deficiencies per statutory notice, the additional deficiencies per amendment to answer, and the total deficiencies claimed by respondent, are as follows:

*Docket No. 89806*

| Year | Deficiency per statutory notice | Additional deficiency per amendment to answer | Total |
|---|---|---|---|
| 1955 | $7,259.25 | $3,566.77 | $10,826.02 |
| 1956 | 8,450.79 | 122.04 | 8,572.83 |
| 1957 | 10,249.11 | | 10,249.11 |

*Docket No. 89963*

| Fiscal year ended | Deficiency per statutory notice | Additional deficiency per amendment to answer | Total |
|---|---|---|---|
| Oct. 31, 1955 | $918.15 | $510.72 | $1,428.87 |
| Oct. 31, 1956 | 1,674.29 | 17.06 | 1,691.35 |
| Oct. 31, 1957 | 1,561.28 | | 1,561.28 |

The only issue is whether $440,000 of the $1,683,237.77 profit from the sale of the Raleigh Hotel in Washington, D.C., constitutes ordinary income rather than capital gain.

FINDINGS OF FACT

Some of the facts have been stipulated and they are found accordingly.

The petitioners in docket No. 89806 are the estate of Betty Berry, deceased, Louis Berry, executor, and Louis Berry, surviving spouse, with offices at 3500 David Stott Building, Detroit, Mich. For the taxable years 1955 through 1957, Betty Berry and Louis Berry filed joint Federal income tax returns with the district director of internal revenue, Detroit, Mich.

The petitioner in docket No. 89963 is the L.C.G. Trust No. 2, created under a declaration of trust dated November 1, 1944, and during the years in issue was a partner of the G.B.M. Co. A. R. Glancy, Jr., is acting as successor trustee with his principal office at 418 Ford Building, Detroit, Mich. Federal income tax returns for the trust for the taxable years ended October 31, 1955, October 31, 1956, and October 31, 1957, were filed with the district director of internal revenue at Detroit, Mich.

The G.B.M. Co. was a partnership with its office in Detroit, Mich., composed of the following persons and entities with percentage interests as indicated.

| | Percent |
|---|---|
| Louis Berry | 40 |
| Peter A. Miller | 40 |
| L.C.G. Trust No. 2, A. R. Glancy, Jr., successor trustee | 15 |
| Glancy Hospital Trust, A. R. Glancy, Jr., trustee | 5 |

On October 26, 1953, a contract of purchase and sale was entered into between Louis Berry and his associates, copartners in the G.B.M. Co., as sellers, and Joseph Massaglia, Jr., as purchaser of the Raleigh Hotel, located at 12th Street and Pennsylvania Avenue NW., in Washington, D.C.

In the negotiations prior to execution of this contract Massaglia was represented by Palmer Johnson as his attorney, and the sellers were represented by Nordblom Co. of Boston, Mass., as one of the brokers, and by Peter A. Miller, one of the partners in the G.B.M. Co., as the other broker. David M. Miro, petitioner Berry's attorney, also represented the sellers in the negotiations.

By letter dated September 1, 1953, Nordblom, as requested by Massaglia, sent Johnson, for the latter's perusal prior to Massaglia's expected arrival in Santa Monica on September 7, 1953, a draft of a proposed "Offer to Purchase" directed to Louis Berry and Peter A. Miller, whereby the buyer agreed to purchase the Raleigh Hotel for $2,800,000 payable: $25,000 with the offer, $535,000 on closing, not later than November 1, 1953, and $2,240,000 by execution of a purchase money bond and mortgage providing for payments of $6,000 per

month, first applied to interest at 4½ percent, balance applied to principal to retire the complete indebtedness in 21 years or until paid out.

Subsequently,[1] Massaglia, through his attorney, made a written offer to the sellers differing in some respects from the proposed offer enclosed with the Nordblom letter of September 1, 1953, but still providing for a purchase price of $2,800,000, with cash payments of $560,000 ($25,000 on acceptance of the offer, and $535,000 on closing) and interest of 4½ percent on the deferred portion of the purchase price, the entire amount of the note to be paid by January 1, 1965. Thereafter, Johnson received a telephone call from a representative of the sellers, believed by him to have been Miller, to the effect that this offer was not acceptable to the sellers and that the only way they would sell would be at a price of $3,240,000—$440,000 greater than the price mentioned in Massaglia's offer—and that the note would be made non-interest-bearing. The representative stated that the additional $440,000 approximately equaled what the interest would be over a period of 11 years under the terms of the offer drawn by Johnson. Johnson replied that this would not be acceptable to the purchasers for the reason that if the note were paid before maturity, the purchaser would be penalized. Later, the representative of the sellers again telephoned Johnson and suggested the use of a prepayment discount schedule whereby, if the non-interest-bearing note were paid off in advance of the 11 years, an amount which was reduced year by year would be deducted from the note. Johnson satisfied himself that the schedule was roughly parallel to the interest on the deferred payments under the offer of Massaglia and agreed to the suggestion of the sellers' representative. The contract dated October 26, 1953 (Exhibit 9–I), was drafted by Miro upon Berry's instructions and after consultation with Berry and Miller.

The contract dated October 26, 1953, consists of a written offer executed by Joe Massaglia, Jr., to purchase the Raleigh Hotel property, containing a long recitation of the terms and conditions of the offer. The offer is directed to Louis Berry and Peter A. Miller and the document (Exhibit 9–I) contains an acceptance clause signed by Berry and Miller wherein they "accept the foregoing offer of Joe Massaglia, Jr. to purchase the Raleigh Hotel, Washington, D.C. and agree to sell on the terms and conditions therein set forth." It also contains the acceptance of the two trusts, the other two partners of G.B.M. Co., signed by A. R. Glancy as trustee for each.

The terms and conditions set forth in Massaglia's offer are, in part, as follows:

---

[1] Exhibit 8–H bears the typewritten date, partially erased, of "Oct. 26, 1953."

I, Joe Massaglia, Jr., called the buyer, agree to purchase the Raleigh Hotel * * * Washington, D.C.

\* \* \* \* \* \* \*

The purchase price shall be THREE MILLION TWO HUNDRED AND FORTY THOUSAND DOLLARS * * * payable as follows:

Attached hereto is my certified check for Fifty thousand dollars ($50,000.00) to be cashed by you upon your acceptance of this offer, and I will pay you an additional Five hundred and ten thousand dollars ($510,000.00) in Cashier's or certified check on the closing date, which shall be on or before December 1st, 1953, and not later. I understand that there is a certain first mortgage now against this property held by the National Life and Accident Insurance Company of Nashville, Tennessee, having an unpaid principal balance of $1,139,961.03, and bearing interest at the rate of four per cent (4%) per annum on the unpaid principal balance, and which interest thereon is paid to October 1st, 1953, and payable in installment payments of $12,300.00 per month until September 1st, 1955, and thereafter at the rate of $10,000.00 per month until the maturity date, January 1st, 1965, each installment including interest to date of payment. I will execute a purchase money note payable to you and secured by a recordable second mortgage and chattel mortgage upon the building and land and personal property purchased hereby, to be prepared by your counsel, in the amount of the purchase price less the $560,000.00 total cash payment and the amount due on the said first mortgage on the closing date, and which said purchase money note shall be payable in installments of Six thousand dollars ($6000.00) per month commencing thirty days after the closing date and on the same day of each month thereafter until September 1st, 1955, and then payable in installments of Seven thousand five hundred dollars ($7500.00) per month commencing September 1st, 1955, and on the first day of each month thereafter, all without interest thereon except after default and then at the rate of seven percent (7%) per annum, and the entire amount of said note to be paid not later than January 1st, 1965, said note to contain an acceleration clause in the event of thirty days default and to provide for attorney fees in the event of suit thereon. Said note shall contain a pre-payment discount schedule in accordance with Schedule "A" attached hereto. I have examined the first mortgage to the National Life and Accident Insurance Company of Nashville, Tennessee, and am familiar with the terms thereof, and upon closing agree to assume and perform all the conditions thereof.

\* \* \* \* \* \* \*

This offer may be assigned by me prior to closing to an individual or corporation to be formed for the purpose of taking title thereto, and in such event you agree to accept such assignee as the sole maker of the promissory note and second mortgage and chattel mortgage described above.

\* \* \* \* \* \* \*

SCHEDULE "A" ATTACHED TO OFFER OF JOE MASSAGLIA, JR. TO LOUIS BERRY, OF DETROIT, MICHIGAN, AND PETER A. MILLER, OF NEW YORK CITY, PERTAINING TO THE RALEIGH HOTEL, WASHINGTON, D.C.

SCHEDULE "A"

The following constitutes the pre-payment discount schedule pertaining to the second purchase money note and mortgage referred to in the attached agreement.

In the event of the payment upon any installment date of the entire principal balance owing upon said second purchase money note, there shall be deducted

from the unpaid principal balance the discount set forth opposite the following respective period applicable to the date of such payment in full:

| PERIOD: (payment date) | DISCOUNT FROM PRINCIPAL BALANCE: |
|---|---|
| To and including December 1, 1954 | $400,000.00 |
| To and including December 1, 1955 | 350,000.00 |
| To and including December 1, 1956 | 300,000.00 |
| To and including December 1, 1957 | 250,000.00 |
| To and including December 1, 1958 | 200,000.00 |
| To and including December 1, 1959 | 165,000.00 |
| To and including December 1, 1960 | 130,000.00 |
| To and including December 1, 1961 | 100,000.00 |
| To and including December 1, 1962 | 60,000.00 |
| To and including December 1, 1963 | 30,000.00 |

On or about November 4, 1953, Massaglia and his attorney, Palmer Johnson, caused Raleigh Properties, Inc., to be incorporated under the laws of California, and on November 16, 1953, Massaglia assigned all his right, title, and interest in the above contract to Raleigh Properties, Inc. It is stipulated that the sale of the Raleigh Hotel was consummated on or about November 23, 1953, between the G.B.M. Co., a partnership, the seller, and Raleigh Properties, Inc., a California corporation, the purchaser.

On November 24, 1953, Raleigh Properties, Inc., executed its note in the amount of $1,548,739.10, payable to Louis Berry and his associates, a copartnership trading as G.B.M. Co. The note provided for monthly payments in the amount of $6,000 commencing January 2, 1954, to and including September 1, 1955; $7,500 commencing October 1, 1955, to and including December 1, 1964; the entire amount then remaining unpaid to become due and payable on January 1, 1965. No specific provision was made for the payment of interest, except that each unpaid installment was to bear interest after maturity at the rate of 7 percent per annum until paid. The note contained the following provision:

The right is reserved to prepay the entire sums due hereunder, at any time, without penalty therefor. In the event of the payment upon any installment date, of the entire balance owing hereunder, there shall be deducted from said balance owing hereunder the discount set forth opposite the following respective periods applicable to the date of such payment in full:

PERIOD: (payment date)        DISCOUNT FROM PRINCIPAL BALANCE:

[Same as in contract dated October 26, 1953, set forth above]

All payments received by the partnership on the note were credited by it to principal and none to interest. There were no notations on any of the checks received from Raleigh Properties, Inc., directing the application of the payment represented by the check to either

principal or interest, nor was any check of Raleigh Properties, Inc., accompanied by a letter of transmittal giving any directions.

On its books, Raleigh Properties, Inc., entered the hotel properties at a cost of $2,800,000, and set up $440,000 as "prepaid interest." Thereafter, Raleigh Properties, Inc., set up on its books each year, and claimed as a deduction in its returns, a proportional part of the $440,-000 as an interest expense. The Internal Revenue Service audited the books of Raleigh Properties, Inc., for the taxable years 1954, 1955, and 1956, and disallowed the interest deduction. Raleigh Properties, Inc., appealed the Commissioner's determination to the Tax Court, *Raleigh Properties, Inc., supra*, and this Court held that the stated purchase price of $3,240,000 included $440,000 of prepaid interest, a proportional part of which the petitioner therein, Raleigh Properties, Inc., was entitled to deduct in each of the taxable years.[2] At the trial of the instant case, the Court was asked to take judicial notice of the above decision.

The Internal Revenue Service audited the returns of the G.B.M. Co. partnership for the taxable years 1954, 1955, 1956, and 1957 and determined that the part of the profit from the sale of the Raleigh Hotel represented interest, and therefore was taxable as ordinary income under section 61(a)(4) of the Internal Revenue Code of 1954. In accordance with this determination deficiencies for the taxable years involved were asserted against the petitioners, each a partner in the G.B.M. Co., based upon their distributive share of the ordinary income.

In the statutory notices of deficiencies respondent determined that of the $1,708,739.10 profit that was reported on this sale, $1,308,739.10 constitutes capital gain and $400,000 is ordinary income. This allocation was based on the prepayment discount, commencing December 1, 1954, as set forth in the contract and note. The additional $40,000 income was claimed in an amendment to the answer and is attributable to the period from November 24, 1953, the date of the note, to December 1, 1954, the date on which the note could have been discounted by $400,000 if payment in full had been made at that time.

OPINION

This case involves the same transaction as was involved in the case of *Raleigh Properties, Inc., supra*, decided by this Court on June 22, 1962. The material facts are substantially the same. All of the operative documents, or copies thereof, i.e., the offer (Exhibit 8–H), the contract of purchase and sale (Exhibit 9–I), and the note (Exhibit 10–J), were introduced in evidence in both proceedings. Palmer

---

[2] An appeal from this decision was filed by the Commissioner and later dismissed pursuant to stipulation of the parties thereto.

Johnson, who represented the purchaser, testified in both proceedings. The petitioner Louis Berry, one of the copartners in the G.B.M. Co., sellers of the Raleigh Hotel, though not a party to the former proceeding, likewise testified in both proceedings—in the former proceeding by deposition and in the present proceeding in person. The same basic issue involved in the former case is presented herein—whether $440,000 of the stated purchase price represents prepaid interest. The only difference between the two cases is that in the former case the purchaser was the petitioner and claimed that $440,000 of the stated purchase price represented interest, whereas, in the present case, two of the copartners in the G.B.M. Co., sellers of the property, are petitioners and contend that no part of the stated purchase price represents interest.

In the *Raleigh Properties, Inc.*, case we held that the stated purchase price of $3,240,000 included $440,000 of prepaid interest, stating:

In *Elliott Paint & Varnish Co.*, 44 B.T.A. 241, a case involving somewhat similar circumstances, this Court stated at page 245:

"* * * The question must turn, of course, upon what was the actual agreement of the parties. Was it an agreement to pay so much as purchase price and the balance as interest? This must be determined from all of the evidence, documentary and otherwise."

An intention of the parties different from that expressed in the documents witnessing their agreements will not lightly be assumed. The true substance of that intention is to be determined, however, from all of the evidence and is not limited to the formal contract or note. *Elliott Paint & Varnish Co., supra; Judson Mills*, 11 T.C. 25. Facts, not semantics, govern. Cf. *Court Holding Co.*, 324 U.S. 331.

Despite the recitation in the contract that the note is to be without interest, we are satisfied that interest was intended and paid.

Petitioner's first offer to the sellers, dated October 26, 1953, proposed a price of $2,800,000 with an 11-year note in the approximate amount of $1,090,000, bearing interest at 4½ percent, to be taken back by the sellers. The sellers' attorney contacted petitioner's attorney with respect to this offer. He noted that the interest thereunder would total very close to $440,000 over the term of the note, and stated that the sellers insisted that the $440,000 be added to the purchase price and to the note, and that the note be made non-interest-bearing. Petitioner's attorney refused to accept this proposition, pointing out that petitioner had prepayment privileges and that the seller was, in effect, proposing that interest for the full period of the note be added thereto. Thus, if petitioner were to prepay under such circumstances, it would be paying interest for the full 11-year term of the note.

The sellers' attorney then proposed a prepayment-discount schedule to be included in the contract and note, providing specified discounts in decreasing amounts over the term of the note. Petitioner's attorney accepted this proposal after satisfying himself that if petitioner prepaid the note as discounted on any of specified dates, the resultant cost to petitioner would approximate the originally-contemplated principal payments plus 4½ percent interest to the date paid.

The discount schedule was included in the contract and note. The $440,000 added to the stated purchase price and to the note is within $200 of the amount

petitioner would have paid in interest under the terms of the buyer's offer of October 26, 1953.

In *Elliott Paint & Varnish Co.*, *supra*, the purchaser originally offered $27,500 in cash for a piece of property. The seller refused the offer, preferring a deferred-payment plan. The final purchase price of $40,000 was agreed upon after a computation had been made for the seller showing that $27,500 plus interest thereon at 5 percent per annum for 10 years would total $41,250. This or a similar computation was discussed by the parties in arriving at the purchase price of $40,000. On brief, the petitioner therein set forth a table dividing the semiannual payments called for by the contract into principal and interest at 5½ percent on a declining balance of principal. The Court rejected the assertion that part of each payment constituted interest, but noted at page 246:

"* * * If the parties had actually adopted such a table as a part of their agreement, it might be pretty strong evidence in support of the petitioner's contention."

In the instant case the discount schedule included in the contract and note (being a mathematical parallel of interest at 4½ percent), the treatment of the amount on petitioner's books and all of the circumstances surrounding the final agreement of the parties convince us that interest was intended. Cf. *Judson Mills, supra.*

With respect to respondent's alternative contention that if the total purchase price of $3,240,000 included an element of interest the amount is neither identifiable nor ascertainable, we find that the evidence establishes both the existence and the amount of the interest.

We think a similar holding is required in the present case.[3] In the absence of a statutory provision to the contrary, the same rules should govern in determining whether interest is includable in income by the seller as are used to determine whether interest is deductible by the purchaser.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

DRENNEN, *J.*, concurs in the result.

---

MULRONEY, *J.*, dissenting: I respectfully dissent. I think the holding in the case of *Raleigh Properties, Inc., supra*, is clearly wrong. It is based upon a passing observation in *Elliott Paint & Varnish Co.*, 44 B.T.A. 241, with respect to a principal and interest table set forth in the taxpayer's brief wherein the author of the opinion commented that if the parties "had actually adopted such a table as a part of their agreement it might be pretty strong evidence in support of the petitioner's contention." Such a statement does not even rise to the dignity of dictum.

The reasoning and conclusion reached in *Elliott Paint & Varnish Co., supra*, is strong authority for petitioner's position here, as is also *Clay B. Brown*, 37 T.C. 461, affd. 325 F. 2d 313, certiorari granted 377 U.S. 962.

[3] It is to be noted that the Internal Revenue Code was amended by sec. 224(a) of the Revenue Act of 1964, which added sec. 483, providing that where a deferred payment contract provides for no interest or interest at an unreasonably low rate a portion of each payment after the first 6 months shall be treated as interest income to the seller.

The majority opinion is clearly contrary to the many holdings of this and other courts, all to the effect that an installment sale contract that does not provide for interest on deferred payments cannot be construed by the tax collector as involving the payment of interest.

In addition to *Elliott Paint & Varnish Co.* and *Clay B. Brown*, both *supra*, which are authority for petitioner, the following are the citations of a few other cases decided before and since the holding in *Raleigh Properties, Inc.*, which support petitioner: *Carl Lang, et al.*, 3 B.T.A. 417; *Daniel Bros. Co.* v. *Commissioner*, 28 F. 2d 761 (affirming opinion of this Court); *Henrietta Mills* v. *Commissioner*, 52 F. 2d 931 (affirming opinion of this Court); *Hundahl* v. *Commissioner*, 118 F. 2d 349; and *Kingsford Co.*, 41 T.C. 646.

This case is stronger for the taxpayer than most of the cited cases. Here the contract between the parties not only did not provide for interest but specifically provided *against* any interest, in that it stipulated the deferred payments were to be without interest. Not only was petitioner's evidence all to the effect that the contract was to be without interest but respondent's one witness, Palmer Johnson, who represented the purchaser, testified to the same effect.[1] Respondent's position here is that the contract which the seller rejected (price $2,800,000 and 4½-percent interest on deferred payments) and the buyer admitted he could not get, was the true agreement between the parties. The parties were free to contract for an installment sale without providing for interest on the deferred payments. Respondent writes a new contract for them when he fails to give effect to the no-interest provision.

The fact that the purchaser agreed to pay the final purchase price without interest on deferred payments because it was close to (but not identical with) his original offer with interest on deferred payments is immaterial. *Elliott Paint & Varnish Co., supra.* That fact should not have given the purchaser interest deductions and it should not give the seller interest income. The prepayment discount schedule is likewise immaterial on the issue of whether or not the installment contract provided for interest. A discount from the deferred payment price for cash or early payment does not render the discount interest.

---

[1] The following is a portion of Johnson's testimony:

"A. Mr. Miller told me that there would be no deal if the contract were written as I had written it, stating that the price was two million eight, and that the interest was 4½ percent. He told me that. Mr. Miller did not tell me anything about how the $440,000 was to be treated on our books.

"Q. Didn't Mr. Miller tell you that unless the face of the note were $3,240,000 less the mortgages the seller wouldn't sell?

"A. Yes, that's true.

"Q. And that if the note wasn't made specifically noninterest bearing, they wouldn't sell?

"A. That's right."

*Kingsford Co., supra; Hundahl* v. *Commissioner, supra.* The fact that in the event of default the buyer was liable for the full purchase price shows conclusively that the discount was not interest.

I feel we made a mistake when we allowed the purchaser the interest deduction in *Raleigh Properties, Inc.* That should not prevent us from now refusing to hold the seller received interest income when all of the facts and the applicable law practically command such a conclusion.

FORRESTER, *J.*, agrees with this dissent.