Estate of William L. Bonnell, Deceased, Mae Bonnell Penka, Executrix, and J. L. Glover, Executor v. Commissioner.
Estate of Bonnell v. Commissioner
Docket No. 3032-69.
United States Tax Court
T.C. Memo 1971-263; 1971 Tax Ct. Memo LEXIS 71; 30 T.C.M. (CCH) 1127; T.C.M. (RIA) 71263; October 12, 1971, filed Frazer Durrett, Jr., Jones, Bird *72 & Howell, 4th Floor, Haas-Howell Bldg., Atlanta, Ga., Welborn B. Davis, Jr., and J. L. Glover, for the petitioner. David S. Meisel and Richard G. Holloway, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: Respondent determined a deficiency in the Federal income tax of the Estate of William L. Bonnell, hereafter called petitioner, for the period from December 1, 1965, to October 18, 1966, in the amount of $26,587.80. The issue is 1128 whether the estate received income at the time of collection of a note bearing no interest, which note had been received in a prior year in a taxable exchange. Findings of Fact Some of the facts were stipulated; the stipulations of fact and the exhibits attached thereto are incorporated herein by reference. William L. Bonnell, hereafter referred to as Bonnell, was a resident of Newman, Georgia, prior to his death in December 1960. An income tax return for Bonnell's estate for the period at issue was filed with the district director of internal revenue, Atlanta, Georgia. His will named his widow, now Mae Bonnell Penka, and hereafter referred to as Mae, and J. L. Glover, hereafter referred to *73 as Glover, as executrix and executor, respectively. After certain specific bequests were satisfied, including an outright bequest of one-half of the estate to Mae, the will directed that the residue of the estate be placed in trust with Mae and Glover as trustees. The trust was to distribute income currently to Mae with the residue at the time of Mae's death to go to Bonnell's son. The will provided that income from the part of the estate set aside to pay debts, taxes, expenses, general legacies, and other corpus charges was to go directly to Mae and not be added to the corpus of the trust. The will further provided that Glover, acting alone as trustee, had the power to encroach on the corpus of the trust during Mae's life to maintain the standard and manner of living to which Mae had been accustomed and to provide for her proper support and comfort. However, the trust was not established and the estate remained unsettled until October 18, 1966. At some time during the fiscal period from December 1, 1965, to October 18, 1966, the remaining assets of the estate valued at $829,185.32, including the proceeds of the note to be discussed in the following paragraphs, were distributed to *74 the trust described above. A final fiduciary income tax return for the estate was filed reflecting the distribution. Mae and Glover, whether acting as executors or trustees, were authorized by the will to sell any property of the estate or trust to Mae at a price agreed to by Mae and Glover, her co-executor or co-trustee. In Item 11(a) of the will, the executors or trustees were given the power generally to sell, exchange, or dispose of property. In April 1962, Mae purchased 72,600 shares of common stock of the William L. Bonnell Company from the residue of the estate for a total sales price of $263,538. As payment for the stock, she executed a promissory note in that amount payable to the order of the Executors of the Estate of William L. Bonnell, secured by a simultaneous assignment to the estate of the entire 72,600 shares of common stock. The note was payable on or before five years from the date of execution and did not provide for interest so long as Mae was living; however, if she died prior to the maturity date thereof, the principal amount would bear interest at 6 percent per annum running from the date of Mae's death until the principal was paid. In addition to the stock *75 which was assigned as security for the note, Mae had substantial personal wealth. Shortly before the execution of the note in 1962, Glover had caused the outright distribution to her of assets valued at approximately $950,000 pursuant to a so-called marital deduction clause in the will. The stock which was sold to Mae was the principal asset remaining in the estate following this distribution. The note was paid in full in December 1965; the funds received were invested in savings certificates in the name of the executor until the early part of 1966. At that time, the funds were transferred to the trustees as required by the will. Item 14 of the will provided that with respect to both the estate and the trust, Mae and Glover in their fiduciary capacities were given the authority in determining income: to amortize, or fail to amortize, any part or all of the premium or discount, to treat any part or all of the profit resulting from the maturity or sale of any asset, whether purchased at a premium or at a discount as income or corpus or apportion the same between income and principal, to treat any dividend or other distribution on any investment as income or corpus or apportion the *76 same between income and corpus, to charge any expense against income or corpus or apportion the same * * * all as [they] may reasonably deem equitable and just under all the circumstances. For accounting purposes, the note in its entirety was allocated to principal in 1962 as were the entire proceeds of the note when paid in 1965. The income tax return for the estate for the taxable period beginning December 1, 1965 and ended October 18, 1966, during 1129 which the note was paid, included the following statement: Note: This return does not include $57,048.07 in income which should properly have been reported as capital gain in the fiscal year ended November 30, 1962, from the sale of 72,600 shares of stock of The William L. Bonnell Company, Inc. The proceeds of said sale was represented by a note which was collected in full during the current taxable year. In its tax return for the fiscal year ended November 30, 1962, the year in which the stock was sold and the note received, the estate discounted the value of the note from its face amount, $263,538, to $206,489.93 and reported that amount as the amount realized from the sale of stock. The amount of the discount was *77 based on a rate of 5 percent and a period to maturity of 5 years. The face amount of the note and the amount of the discount taken and the reason therefor were clearly set forth in the fiduciary return for the fiscal year 1962. Respondent's notice of deficiency was based on a determination that petitioner's basis for income tax purposes in the note was $206,489.93, that the receipt during the period ended October 16, 1966, of $263,538 in payment of the face amount of the note represented collection of the note and not a sale or exchange and that ordinary income of $57,048.07 was realized and was omitted from the return. At all times relevant hereto, Glover's residence was Newnan, Georgia. At the time of filing of the petition, Mae's residence was Santa Barbara, California. Opinion In a 1962 exchange for stock, petitioner received a noninterest-bearing note for the full purchase price. The note was paid in full in 1965. For purposes of reporting the 1962 transaction, petitioner discounted the note and showed as proceeds from the sale the discounted amount. For purposes of reporting the collection of the note in 1965, the year at issue here, petitioner claims error in the prior *78 year, i.e., that the note should not have been discounted; petitioner's conclusion is that since the 1962 discount was inappropriate, there is no income in 1965 as a result of receiving proceeds in excess of the note's basis. Petitioner's claim that the discount was inappropriate centers on the relationship between itself, the estate of William Bonnell, and Mae, the purchaser of the stock and obligor on the note who is the sole income beneficiary of the estate. The issues in this case are two-fold. First, does the value assigned by petitioner in 1962 to a note received in connection with a taxable transaction control the note's basis at the time of collection in December 1965? Second, if the 1962 value is determinative, does the collection of the note, to the extent that the proceeds exceed basis, result in ordinary income or capital gain? Turning to the first issue, two subsidiary arguments evolve. First, was the discount of the note in 1962 proper? [1] For if it were, it obviously could not be disturbed in the year of its collection. Secondly, even if the discount was improper in the year of the exchange, is petitioner barred as a matter of law from correcting the error? *79 Since the sale of the stock in 1962 was a closed transaction upon receipt of the negotiable note, see Burnet v. Logan, 283 U.S. 404, 414 (1931); Estate of Clarence W. Ennis, 23 T.C. 799 (1955), we cannot consider the actual receipt of cash in 1965 on satisfaction of the note as merely being the final step in the sale of the stock. It is clear from the outset that the beginning point in the determination of basis of an item received in an exchange is its fair market value at the time of receipt. This is an obvious necessity to accommodate section 1001(b), I.R.C. 1954, [2] which states in part: The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received. * * * To compute gain or loss on the first of two transactions (the sale of stock to Mae) by reference to the value of that which is received (her note), see Harry Leland Barnsley, 31 T.C. 1260 (1959) *80 and cases cited therein; but then to compute gain or loss on the subsequent disposition (payment of the note) of the property received in the exchange by reference to some other value as its basis would work a clear inequity to either the taxpayer or the Government. Considering the net change in value from the acquisition of the first 1130 asset (the stock) to the disposition of the second (the note), the use of different interim amounts (as proceeds of the sale of stock and basis for the note) would cause either too much or too little gain or loss to be recognized. Section 1012 provides that "The basis of property shall be the cost of such property," Edward W. Edwards, 19 T.C. 275, 279 (1952); Hugh M. Matheson, 31 B.T.A. 493 (1934), affd. 82 F. 2d 380 (C.A. 5, 1936). In the instance of a taxable exchange of property, the basis of that acquired, or its "cost," is equal to its value, Bar L Ranch, Inc. v. Phinney, 426 F. 2d 995 (C.A. 5, 1970); Halsey L. Williams [Dec. 25,402], 37 T.C. 1099 (1962), or the value of that *81 which is given up since there is a presumption that the two values are equal. Philadelphia Park Amusement Co. v. United States, 126 F. Supp. 184 (Ct. Cl. 1954). But see Bar L Ranch, Inc. v. Phinney, supra.Since there has been presented to us no evidence on the value of the stock sold, we must look directly to the value of the note at the time received to determine its basis in the hands of petitioner. Both petitioner and respondent agree that the general rule in determining the value of a debt instrument is to give consideration to the fact that it bears no interest. Both apparently agree that the 5 percent discount factor applied by petitioner for income purposes at the time the note was received was an appropriate rate if one should be applied at all. What we are thus asked to decide is whether under the circumstances of the relationship betwen obligor and obligee, it was inappropriate to discount the note in arriving at its value for purposes of reporting the gain on the sale of the securities and for purposes of determining the basis of the note upon its subsequent collection. As we understand petitioner's argument, it is that in determining the *82 value and thus the basis of Mae's note in the hands of the estate, the special circumstances and economic realities rather than mere form must be considered. Petitioner argues specifically that because the debt instrument had a greater market value to the petitioner for reasons extrinsic to the transaction (sale of the stock), the higher value must be applied. Bertha M. Bailey et al., Executors, 37 B.T.A. 647 (1938). Viewing the realities of the transaction, we are not convinced, as petitioner suggests, that the Bailey case, supra, leads us to the assignment of face value to Mae's note as its basis. In Bailey, the taxpayer sold property to R corporation and received notes of that corporation in exchange. At the time of the exchange, R corporation held notes owed by the taxpayer who was also the principal shareholder of R corporation. There the taxpayer's argument was that R corporation's obligation received in the exchange was valueless. The Court held to the contrary both as a matter of fact and because the taxpayer's right of set-off precluded a value of less than face for purposes of reporting the sales transaction. Bailey is fundamentally different from this *83 case. In Bailey the taxpayer had a specific, ascertainable and immediate offset against an enforceable liability owed to the buyer. This offset may be equated with cash. Farming Corporation, 11 B.T.A. 1413 (1928); Liberty Agency Co., 5 B.T.A. 778, 788 (1926). See also Peninsula Properties Co. Ltd., 47 B.T.A. 84 (1942). This case has several differences from those facts contained in Bailey. Here there was no specific offset, but merely a bar [3] to the application of a legal doctrine giving an income beneficiary a right to productive investment of assets. [4] The bar arises from 1131 the participation by the beneficiary in the acquisition of nonincome-producing assets. *84 Even if the giving up of the right to productive investment of assets might be equated in theory with the offset of claims existent in Bailey, the magnitude of the right is much less certain in this case than was true in Bailey. Here the income received in the first instance by the estate if there had been an interest-bearing note possibly would be subjected to debts and/or expenses, including legal fees incurred in the continued life of the estate. Furthermore, the estate was not required to distribute income annually; Mae's payment of interest in one year to the estate might be distributed to her two or three years hence, reduced in amount, having been absorbed in part by income taxes paid by the estate on the receipt of that income in a year in which no distribution was made. The way income might have been retained or distributed during the life of the estate is indicated from the few facts available. For whatever reason, the Bonnell estate did remain open from 1960 to 1966. According to the estate's fiduciary return, although the estate earned considerable income in the fiscal year ended November 30, 1962, no income distribution was made. This pattern may have held true for *85 the fiscal years ended in 1963, 1964, and 1965. Clearly the income reecived by the estate did not wash straight through to Mae in the same period. We are unable to find these facts that Mae gave up or the estate received any identifiable or quantifiable right or claim. Petitioner further argues that a finding that the note's basis is equal to its fair market value at the time of the sale of the stock and receipt of the note amounts to adjusting the sales price of the stock by judicial fiat when it cannot be found in fact that interest was intended by the parties. Citing Deputy v. du Pont, 348 U.S. 488 (1940), petitioner argues that interest must be clearly stated in order to be found to exist. However, the result we reach here does not depend on a finding that the parties intended a portion of the note to represent interest.[5]
*86 Of course, it is clear that if the difference between face value and market value of the note was intended by the parties to be disguised interest, the Commissioner could treat it so, resulting in a receipt which was in part capital and in part a payment of interest upon collection of the note. Estate of Betty Berry, 43 T.C. 723 (1965), affd. per curiam 372 F. 2d 476 (C.A. 6, 1967). [6] But as stated previously, there is no argument made here by either party that a portion of the note represented disguised interest. Respondent's argument is that the income in the year of collection is simply the result of a receipt which exceeded the basis of the note which was surrendered.
Since the gain on collection of a note is not designated interest where none is intended, footnote 6, supra, there is no conflict with cases dealing with the purchaser's side of a transaction (i.e., the obligor on a noninterest obligation) holding that the *87 purchase price is the total obligation, unadjusted for the missing interest factor. See United States v. Cornish, 348 F. 2d 175 (C.A. 9, 1965); MacDonald v. Commissioner, 76 F. 2d 513 (C.A. 2, 1935); Daniel Bros. Co. v. Commissioner, 28 F. 2d 761 (C.A. 5, 1928); see Rev. Rul. 67-62, 1967-1 C.B. 44; I.T. 3254, 1939-1 C.B. (Part 1) 98. For the reasons stated above, we hold that the circumstances of this case do not warrant a determination that the market value of Mae's note (and thus its basis) was equal to its face amount. Furthermore, we hold that petitioner has not proven that the note should have been valued at a rate other than the 5 percent discount used upon receipt of the note. Petitioner argues alternatively that if the Court finds the note to have been properly discounted, it should also be found that at the time of the sale, other property was received by the executors. That other property, it is claimed, was the discharge of an obligation or claim on the assets of the estate, having a value equal to the amount of the discount on the note. The substance 1132 and effect of this argument is apparently *88 that upon Mae's later payment of the note, the "other property" was either returned to her or disappeared, but that in either event, it offset what would otherwise have been reportable gain from the collection transaction. In support of this somewhat novel argument that such property existed, petitioner offers Peninsula Properties Co. Ltd., supra; Commissioner v. Mesta, 123 F. 2d 986 (C.A. 3, 1941), certiorari denied 316 U.S. 695 (1941), reversing and remanding 42 B.T.A. 933 (1940); and United States v. Davis, 370 U.S. 65 (1962). The Peninsula Properties case was similar to Bailey, supra, distinguished above, and is distinguished here for the same reasons. In Mesta and Davis, the Court of Appeals and the Supreme Court held that there was a taxable event when property was given to achieve a discharge from a husband's duties of support; furthermore, the courts have held that the value of the support rights was equal to the market value of the assets given. Mesta and Davis, however, turned on the equating of the exchange with a release from an independent legal obligation. In this case the release, if *89 any, was illusory. Item 4(c) of the will authorized Glover, as trustee, to encroach on the corpus in amounts necessary to maintain the standard and manner of living Mae was accustomed to and to provide for her proper support and comfort. Presumably the same power existed with respect to the estate, assuming creditor's claims were not thereby jeopardized. This encroachment could continue whether or not there was income earned either by the estate or by Mae on her personal assets. [7] We are not convinced that given the presence of this clause, Mae's overall economic position was in any way lessened by the giving up of her "right" to the results of a productive investment of the assets. *90 Petitioner's final argument that the executors were in no more favorable position in holding Mae's payment than they were in holding her note is without merit. Once the basis of the note has been established and it is determined that there was no other recognizable element to the transaction of sale of securities, the rule is clear that the difference between basis and the amount received upon collection of the note is income at the time of collection. E. D. Rivers, Jr., 49 T.C. 663 (1968); A.B. Culbertson, 14 T.C. 1421 (1950); John H. S. Lee, 42 B.T.A. 920 (1940), affd. 119 F. 2d 946 (C.A. 7, 1941). Since we have decided that the note's basis must be determined by reference to its market value at the time of its receipt in exchange for the stock, unaffected by the relationship between the obligor and obligee, we hold that the estate received additional income in the year of collection equal in amount to the discount reported in the year the note was received. Decision will be entered for the respondent. Footnotes
1. Section 483, requiring the imputation of interest and concomitant adjustment of basis which might otherwise be controlling in this instance, is inapposite because the sale giving rise to the note occurred prior to the effective date of the addition of that section to the Code↩
2. All references are to the Internal Revenue Code of 1954 unless otherwise stated.↩
3. The bar to an action against the trusteeis discussed in 3 Scott on Trusts, sec. 216, p. 1730, where the author states in part: A beneficiary who consents to an act or omission by the trustee which would constitute a breach of trust cannot hold him liable for the consequences of the act or omission, if the beneficiary was sui juris and had full knowledge of all relevant facts and of his legal rights and if his consent was not induced by any improper conduct of the trustee. Thus a beneficiary cannot complain of a loss resulting from an improper investment made by the trustee with his consent, or of a failure to sell trust property which the trustee was under a duty to sell if the beneficiary consented to its retention * * * ↩
4. The right to productive investment is discussed in 3 Scott on Trusts, sec. 240, p. 2053, where the author states in part: Where a trust is created for successive beneficiaries and the trust estate includes unproductive property, the trustee is ordinarily under a duty to sell the property within a reasonable time, and to invest the proceeds in productive property. * * * The principle here stated is based upon the presumption that the creator of the trust intended that the beneficiary who is entitled to income should receive a benefit from the property, and that if he is receiving no benefit from it because it is unproductive it should be converted into property which will produce an income.↩
5. Even where the only justification of the lesser fair market value of a debt instrument and therefore the basis is the time-price differential, income arising at the time of collection because of a basis less than the proceeds is not treated as interest when none was intended. This is of critical significance when the obligor is a state or municipality and the income, if interest, would be tax exempt. M.C. Parrish & Co., 3 T.C. 119 (1944), affd. 147 F. 2d 284 (C.A. 5, 1945); Newlin Machinery Corporation, 28 T.C. 837 (1957); I.T. 2674, XII-1 C.B. 96↩.
6. This principle was incorporated into section 483 as an irrebuttable presumption; however, that section became effective subsequent to the transaction giving rise to the note at issue here and is therefore inapplicable.↩
7. The right to support without consideration being given to other wealth of the beneficiary is discussed in 3 Scott on Trusts, sec. 128.4, p. 1020, where the author states in part: It is a question of interpretation whether the beneficiary is entitled to support out of the trust fund even though he has other resources. Where the trustee is directed to pay to the beneficiary or to apply for him so much as is necessary for his maintenance or support, the inference is that the settlor intended that he should receive his support from the trust estate, even though he might have other resources. In this case the will stated that the trustee "shall be authorized to encroach on the corpus * * * in such amounts as he may deem necessary in his judgment to maintain the standard and manner of living to which my wife has been accustomed and to provide for the proper support and comfort of my wife."↩