[No. 57437–5. En Banc. January 17, 1991.]

THE DEPARTMENT OF ECOLOGY, *Petitioner,* v. THE STATE FINANCE COMMITTEE, *Respondent.*

*Preston Thorgrimson Shidler Gates & Ellis,* by *Fredric C. Tausend, Elizabeth Thomas,* and *Aaron Keyt,* for petitioner.

*Kenneth O. Eikenberry, Attorney General,* and *David E. Walsh, Deputy,* for respondent.

UTTER, J.—The Department of Ecology (hereinafter DOE) directly petitions this court for a writ of mandamus. The writ would direct the State Finance Committee (hereinafter Committee) to approve the form of the master lease and trust agreement proposed by DOE for construction and lease of its new headquarters. The specific question raised by this petition is whether the lease–purchase agreement developed by DOE and authorized by the Legislature in RCW 39.94 violates the debt limitation provision of article 8, section 1 of the Washington Constitution. The lease expressly provides that DOE's obligation is subject to termination without penalty if sufficient funds are not

appropriated by the Legislature or if the executive orders DOE to cut its budget. For this reason we hold that DOE's financing scheme does not constitute debt within the meaning of the constitution. We therefore grant DOE's requested relief.

DOE currently houses its headquarters staff in 18 separate locations throughout Thurston County. In the 1989 capital budget, the Legislature authorized DOE to pursue a project to develop a consolidated headquarters building. Laws of 1989, 1st Ex. Sess., ch. 12, § 903(3). In 1990, the Legislature further authorized DOE to enter into a financing contract for the acquisition, design, and construction of the headquarters building. Laws of 1990, ch. 299, § 501(1). The financing contract must meet the requirements of RCW 39.94, which provides, in relevant part:

> The state may enter into financing contracts for the use and acquisition for public purposes of real and personal property. Payments under financing contracts shall be made by the state from currently appropriated funds or funds not constituting "general state revenues" as defined in Article VIII, section 1 of the state Constitution. The term of any financing contract shall not exceed thirty years or the remaining useful life of the property, whichever is shorter.

RCW 39.94.030(1). Pursuant to the enabling legislation, DOE developed a comprehensive plan for the headquarters project.[1]

Pursuant to the plan, the State, through the Department of General Administration, entered into a purchase option agreement with the owners of a 45–acre parcel located on the campus of St. Martin's College. The option must be exercised, if at all, on or before January 31, 1991. A bank, acting as trustee, will finance the site purchase and construction costs by issuing and selling Certificates of Participation (hereinafter COP's). The trustee will hold the site in trust for the State.

---

[1]A diagram of the financing scheme is included as an appendix to this opinion.

The trustee will sublease the site to the contractor. Construction costs will be paid from the proceeds of the sale of the COP's. The COP's will give investors the right to receive a proportionate share of whatever payments DOE makes under the master lease. Under the master lease, the contractor will lease the site and the headquarters building to DOE for a term of 20 years. The contractor will then assign its interests in the ground lease and the master lease to the trustee. DOE will make its lease payments to the trustee. The trustee will make interest payments to the COP holders. If DOE makes all the required lease payments, it will receive full title to the headquarters building in 20 years.

Under the terms of the master lease, DOE can terminate its payment obligations at any time if the Legislature fails to appropriate funding for the lease payments, or if an executive order imposes budget cutbacks on DOE. If DOE terminates its lease, then it must vacate the headquarters building. The trustee then may take possession of the building and relet it for the benefit of the COP holders. Any payments received by the trustee on reletting of the building will be used to pay the COP holders. This is the COP holders' only remedy against the State.[2] The actual COP's will include a paragraph warning the holders of the limited nature of the State's obligation.[3] The offering prospectus prepared by the underwriter of the COP's will

---

[2]"Upon any failure of appropriation or other circumstances set forth in the Lease, including executive order, the Lease may be terminated, and the remedies of the owner of this Certificate shall be limited to the property subject to the Lease." Trust Agreement § 10.01, at 27.

[3]"THIS CERTIFICATE IS NOT A GENERAL OBLIGATION OF THE STATE OF WASHINGTON, AND THE FULL FAITH AND CREDIT OF THE STATE ARE NOT PLEDGED TO THE REPAYMENT OF THIS CERTIFICATE. . . . THE OBLIGATION OF THE DEPARTMENT OF ECOLOGY TO MAKE PAYMENTS UNDER SAID LEASE AGREEMENT IS SUBJECT TO APPROPRIATION BY THE STATE LEGISLATURE . . . NOTHING IN THIS CERTIFICATE OR IN THE LEASE AGREEMENT SHOULD BE CONSIDERED AS OR IMPLY A MORAL OBLIGATION ON THE PART OF THE STATE OF WASHINGTON OR THE DEPARTMENT OF ECOLOGY TO

also highlight the fact that DOE's payments will end if the Legislature fails to appropriate sufficient funds, or the executive orders a cutback. Regardless of whether DOE makes all of its lease payments, at the end of the ground lease (30 years) title to the building and other improvements on the site will pass to the State.

As required by RCW 39.94.040(1), DOE submitted its financing agreement to the Committee[4] for its approval. That statute requires the Committee to approve the form of all financing contracts. The Committee has refused to approve the master lease and trust agreements. DOE petitions for a writ of mandamus to require the Committee to approve the form of the agreements.

I

Article 4, section 4 of the state constitution gives this court original jurisdiction in mandamus as to all state officers. That jurisdiction is, however, nonexclusive and discretionary. *Holt v. Morris,* 84 Wn.2d 841, 845–46, 529 P.2d 1081 (1974). Therefore, the first question we must address is whether it is appropriate for us to exercise our jurisdiction.

▮ Whether this court will exercise its jurisdiction depends on the nature of the interests involved. *Tacoma v. O'Brien,* 85 Wn.2d 266, 268, 534 P.2d 114 (1975). Where, as here, the issues involve the constitutionality of a statute and matters relating to the expenditure of public funds, it is appropriate for us to exercise our original jurisdiction. *O'Brien,* 85 Wn.2d at 268.

▮▮ The next question we address is whether a writ of mandamus is the appropriate remedy in this case. A writ of mandamus will not issue where the act to be performed is a discretionary act. *Peterson v. Department of Ecology,* 92

MAKE PAYMENTS HEREUNDER OR THEREUNDER." Trust Agreement § 10.01, at 26.

[4]The State Finance Committee consists of the State Treasurer, the Lieutenant Governor, and the Governor. RCW 43.33.010.

Wn.2d 306, 314, 596 P.2d 285 (1979). The writ is only appropriate where a state officer fails to perform "an act which the law especially enjoins as a duty resulting from an office". RCW 7.16.160. DOE contends that the Committee, in failing to approve the form of the lease agreement, failed to perform an act required by RCW 39.94.040(1). That statute, in pertinent part, provides:

> Except as provided in RCW 28B.10.022, the state finance committee *shall* approve the form of all financing contracts . . ..

(Italics ours.)[5] The use of the word "shall" in a statute generally imposes a mandatory duty. *Spokane Cy. ex rel. Sullivan v. Glover*, 2 Wn.2d 162, 169, 97 P.2d 628 (1940). While there are circumstances where "shall" is interpreted as not imposing a mandatory duty,[6] counsel for the Committee admits that the duty to approve the form of the agreement is mandatory. Therefore all the parties agree that a writ of mandamus is the appropriate remedy. We turn then to the question of whether a writ will issue in this case.

## II

The Committee's sole reason for refusing to approve the form of DOE's financing contract is that the Committee believes the scheme violates the debt limitation provision of article 8, section 1 of the state constitution. Article 8, section 1(b) provides:

> The aggregate debt contracted by the state shall not exceed that amount for which payments of principal and interest in any fiscal year would require the state to expend more than nine percent of the arithmetic mean of its general state revenues for the three immediately preceding fiscal years as certified by the treasurer.

---

[5]RCW 28B.10.022 applies only to institutions of higher education.

[6]*See, e.g., Spokane v. Spokane Police Guild*, 87 Wn.2d 457, 553 P.2d 1316 (1976).

Whether the legislatively authorized DOE financing plan violates that debt limitation[7] provision depends upon whether the plan constitutes "debt" within the meaning of article 8.

■ As a preliminary matter, we note that the Legislature's clear intent is that this financing plan does not amount to debt within the meaning of article 8. RCW 39.94.030(4) states:

> Financing contracts . . . entered into under the limitations set forth in this chapter shall not constitute a debt or the contracting of indebtedness under . . . any . . . law limiting debt of the state. It is the intent of the legislature that such contracts also shall not constitute a debt or the contracting of indebtedness under Article VIII, section 1 of the state Constitution. . . . It is the intent of the legislature that [certificates of participation] also shall not constitute a debt or the contracting of indebtedness under Article VIII, section 1 of the state Constitution if payment of the certificates is conditioned upon payment by the state under the financing contract . . . ..

In questioning the validity of the DOE financing plan, the Committee is really challenging the constitutionality of RCW 39.94's declaration that the plan is not debt. That statute was duly enacted by the Legislature pursuant to its constitutional authority to enact any law not expressly or inferentially prohibited by the state or federal constitutions. *See Union High Sch. Dist. 1 v. Taxpayers of Union High Sch. Dist. 1,* 26 Wn.2d 1, 7, 172 P.2d 591 (1946). As such, the statute is presumed to be constitutional, and the challenging party has the burden of establishing beyond a reasonable doubt that the statute is unconstitutional. *Sator v. Department of Rev.,* 89 Wn.2d 338, 346, 572 P.2d 1094 (1977). The Committee, in essence, argues that the debt limitation provision of article 8 prohibits the Legislature from enacting RCW 39.94. In so doing the Committee asks us to ignore the clear legislative intent and the specific

---

[7]RCW 39.42 also imposes limitations on the amount of debt the State may incur. It does not, however, define debt differently than article 8, section 1. Therefore, if the headquarters financing scheme does not constitute debt for purposes of article 8, then that scheme is not subject to the limitations of RCW 39.42.

determination by the Legislature that such financing contracts do not constitute debt. The Committee asks us to declare RCW 39.94 unconstitutional. This we cannot do unless RCW 39.94 clearly conflicts with the constitution. *State ex rel. Wittler v. Yelle,* 65 Wn.2d 660, 665, 399 P.2d 319 (1965).

The constitution defines debt as follows:

> In computing the amount required for payment of principal and interest on outstanding debt under this section, debt shall be construed to mean borrowed money represented by bonds, notes, or other evidences of indebtedness which are secured by the full faith and credit of the state or are required to be repaid, directly or indirectly, from general state revenues . . . but shall not include obligations for the payment of current expenses of state government . . ..

Const. art. 8, § 1(d). Under the plain language of the constitution, debt is borrowed money that is either backed by the full faith and credit of the State or that is required to be repaid from general state revenues.

 Under a plain reading of the trust agreement and master lease, DOE's financing plan is not debt within the meaning of article 8 for two reasons. First, the COP's are not backed by the full faith and credit of the State.[8] Second, because of the nonappropriation clause, the State is not obligated to pay the COP holders. The trust agreement specifically states:

> The Lease Payments and the Certificates evidencing rights to receive such Lease Payments are payable solely from payments to be received by the Trustee from DOE pursuant to the Lease. *The Lease and the Certificates therein shall not constitute an obligation, moral or otherwise, of the State.*

(Italics ours.) Trust Agreement § 3.07, at 10. The nonappropriation clause allows DOE to terminate the lease whenever the Legislature fails to appropriate sufficient funds. Future Legislatures are not obligated to continue funding the lease, and the State's assets are not subject to suit by the COP holders in the event DOE terminates the lease. The ultimate risk of loss is not on the State's future

---

[8]See footnote 3.

taxpayers. Instead, the risk of loss is on the COP holders, who will have entered into the transaction with full knowledge that they alone bear that risk. After reading the plain language of the constitution, the statute, and the lease and trust agreements, this financing scheme does not incur debt within the meaning of the constitution.

This holding is consistent with our prior case law dealing with debt limitations. We have consistently held that debt only occurs when the State is *obligated* to make payments. *See Wittler,* 65 Wn.2d at 668 (debt is "obligation" to repay borrowed money); *State ex rel. State Fin. Comm. v. Martin,* 62 Wn.2d 645, 661, 384 P.2d 833 (1963) (debt is an "obligation which must in law be paid from any taxes levied generally"); *State ex rel. State Bldg. Fin. Auth. v. Yelle,* 47 Wn.2d 705, 289 P.2d 355 (1955); *State ex rel. State Capitol Comm'n v. Lister,* 91 Wash. 9, 16, 156 P. 858 (1916) (statutory requirement that state levy taxes each year to meet interest payment amounts to debt). Under DOE's plan the nonappropriation clause and the express language of the lease and trust agreements make it clear that there is no *obligation* on the part of the State to appropriate any funds in connection with the lease agreement. An "obligation" is "something . . . that binds or constrains to a course of action . . . a formal and binding agreement or acknowledgment of a liability to pay a specified sum or do a specified thing". *Webster's Third New International Dictionary* 1556 (1976). There is *nothing* in the lease agreement or the financing scheme that binds the State to any future course of action. Therefore, there is no "*obligation*", and no "*debt*".

The Committee incorrectly argues that DOE's financing plan is similar to the one we disallowed in *State ex rel. State Bldg. Fin. Auth. v. Yelle, supra.* The facts in that case make it totally inappropriate. There, the Legislature created a building authority to finance the construction of buildings that were to be leased to state agencies. Those agencies would then pay rent directly to the authority. The authority had the power to issue bonds, set and collect

rental rates, and to pledge all of its revenues as security for its obligations. 47 Wn.2d at 706. The authority, and not the State, was obligated to pay the interest on the bonds. This court declared that the above financing scheme violated the constitutional debt limit. However, that scheme differs from the DOE plan in two significant ways.

First, the authority was a *state agency*. 47 Wn.2d at 713. Thus, any obligation of the authority to pay the bondholders was, in reality, an obligation of the State. Under the DOE plan the trustee is *not* a state agency. Therefore, any obligation the trustee may have to pay the COP holders is not an obligation of the State.

Second, under the building authority plan, the Legislature was *required* to appropriate sufficient funds to cover the rental payments of the lessor agencies. 47 Wn.2d at 712–13. Under the nonappropriation clause of the DOE plan, however, the State is *not* obligated to appropriate funds to cover DOE's lease payments. Therefore, the plan does not create debt within the meaning of the constitution.

Our decision is supported by holdings in our sister states. The overwhelming majority of jurisdictions that have considered the issue have concluded that a nonappropriation clause precludes the creation of debt.[9] In *State ex rel. Kane v. Goldschmidt*, 308 Or. 573, 783 P.2d 988 (1989), the Oregon Supreme Court approved a plan similar to DOE's

---

[9]*See, e.g., Glennon Heights, Inc. v. Central Bank & Trust,* 658 P.2d 872, 878–79 (Colo. 1983); *State v. School Bd.,* 561 So. 2d 549 (Fla. 1990); *Berger v. Howlett,* 182 N.E.2d 673, 674–75 (Ill. 1962); *State ex rel. Fatzer v. Armory Bd.,* 174 Kan. 369, 256 P.2d 143, 146–51 (1953); *Edgerly v. Honeywell Information Sys., Inc.,* 377 A.2d 104, 108 (Me. 1977); *Ruge v. State,* 201 Neb. 391, 267 N.W.2d 748, 750–52 (1978); *Enourato v. New Jersey Bldg. Auth.,* 182 N.J. Super. 58, 440 A.2d 42, 46–47 (1981), *aff'd,* 448 A.2d 449 (N.J. 1982); *Caddell v. Lexington Cy. Sch. Dist. 1,* 373 S.E.2d 598, 599 (S.C. 1988); *McFarland v. Barron,* 164 N.W.2d 607, 609–10 (S.D. 1969); *Texas Pub. Bldg. Auth. v. Mattox,* 686 S.W.2d 924, 928 (Tex. 1985); *Baliles v. Mazur,* 297 S.E.2d 695, 697–98 (Va. 1982); *State ex rel. West Virginia Resource Recovery–Solid Waste Disposal Auth. v. Gill,* 323 S.E.2d 590, 594–95 (W. Va. 1984); *Dieck v. Unified Sch. Dist.,* 157 Wis. 2d 134, 458 N.W.2d 565 (1990). *But see Montano v. Gabaldon,* 108 N.M. 94, 766 P.2d 1328, 1329–30 (1989) (lease–purchase agreement with nonappropriation clause creates moral obligation to continue payment, and therefore creates debt).

plan. Oregon, like Washington, has a constitutional debt limitation. The statute at issue in *Kane* authorized the Legislature to enter into long–term financing agreements similar to the DOE plan. That statute contained a nonappropriation clause that limited the liability of the State. 308 Or. at 584–85. In upholding the financing scheme, the Oregon court first defined debt as:

> an unconditional and legal obligation of the state to pay, when at the time the obligations initially are created there are insufficient unappropriated and not otherwise obligated funds in the state treasury to meet those obligations.

308 Or. at 583. The court then held that, because of the nonappropriation clause, the financing scheme did not create debt.

> The state's promise of repayment is conditioned on the willingness of future legislative assemblies to appropriate the funds. The state does not promise that future legislatures will appropriate any funds. The lenders take the risk of nonpayment.

308 Or. at 586.

A similar situation exists in the case before us, and we find the Oregon court's reasoning persuasive. DOE's financing plan does not require future Legislatures to appropriate funds. Instead, the plan gives future Legislatures the flexibility to continue the funding or not, depending upon budgetary needs. The plan places the appropriation decision where it belongs, in the hands of the collective wisdom of future legislators. Since the plan does not impose upon future Legislatures a requirement of continued funding, the plan does not create debt.

■ The purpose of the original article 8, section 1 debt limitation was to protect the integrity of the State's economy. *State ex rel. State Bldg. Fin. Auth. v. Yelle,* 47 Wn.2d at 715. Constitutional debt limitations were enacted to protect future taxpayers from the kind of improvidence that led to state and local government bankruptcies in the 19th century. Note, *State and Municipal Lease–Purchase Agreements: A Reassessment,* 7 Harv. J.L. & Pub. Pol'y

521, 525 (1984). In 1972 the people amended article 8, section 1 to its present form. That amendment changed the method by which the debt ceiling is calculated, but the amendment did not change the purpose of the limitation. DOE's plan fulfills that purpose. The nonappropriation clause protects future taxpayers by giving their representatives the power to terminate the lease.

The Committee argues that approving the DOE plan will render the debt limitation provision meaningless. According to the Committee, the State will simply finance all projects through similar plans, and thereby avoid the debt limitation altogether. We find the Committee's argument unpersuasive for two reasons.

First, the DOE financing plan would not be appropriate for all state projects. In DOE's case, the Legislature and DOE determined that the benefits of the plan outweigh the added costs of the higher interest on the COP's.[10] In future cases, however, the Legislature may well determine that other financing plans are more appropriate.

Second, the Committee's argument fails to consider the clear will of the people that these type of financing plans do not constitute debt within the meaning of the constitution. The 1972 constitutional amendment clearly defines debt as borrowed money that is either secured by the full faith and credit of the State, or that is required to be repaid out of the general revenue. As explained above, the DOE plan is not backed by the full faith and credit of the State, and the State is not obligated to repay any funds. Therefore, the DOE plan does not create debt within the meaning expressly approved by the people through the 60th amendment to the constitution.

Additionally, the Legislature expressly declared that this type of financing plan does not constitute debt within the meaning of the constitution. RCW 39.94.030(4). That legislative declaration is presumed to express the will of the

---

[10]Because the COP's are not backed by the full faith and credit of the State, their interest rate will be relatively high.

people. Thus, the people have spoken through two vehicles, the constitutional amendment and the Legislature. It is not within this court's prerogative to set aside the will of the people.

CONCLUSION

The DOE financing plan is not backed by the full faith and credit of the State. The plan does not obligate the State to appropriate any funds for the project or the subsequent lease. The nonappropriation clause allows future Legislatures and future executives the flexibility to terminate or continue the lease as they see fit. Therefore, the plan does not create debt within the meaning of article 8, section 1 of the Washington Constitution. Since the State Finance Committee has not met its burden of proving beyond a reasonable doubt that RCW 39.94 is unconstitutional, the Committee must approve the form of the financing plan. We therefore grant petitioner's requested relief and issue a writ of mandamus ordering the State Finance Committee to fulfill its obligations under RCW 39.94.040(1).

DOLLIVER and SMITH, JJ., concur.

# APPENDIX

Department of Ecology
Headquarters Building Project
Transaction Summary

GUY, J. (concurring)—While I concur with the majority opinion, I write separately to make clear the limited effect of that opinion.

Our state constitution contains a debt limitation in article 8, section 1. That limitation may not be exceeded, directly or indirectly, without approval by a vote of the people. I believe that it is important to emphasize that long–term lease agreements may not be used as a subterfuge to avoid the constitution's debt limitation.

In this case, the full faith and credit of the State was not pledged, and the DOE may vacate the leased premises without further liability in the event the Legislature determines not to continue funding. The DOE did not bind itself under its financing plan to a long–term financial commitment in the event of changing needs. Therefore, the DOE's financing plan is not debt within the meaning of article 8, and so cannot be regarded as a subterfuge to avoid the constitution's debt limitation. In addition, the Legislature authorized the DOE to enter into the leasing arrangement involved in this case. By so doing, it determined that for the DOE to house itself in 18 separate buildings with no prospect of eventual state ownership was not a sound governmental or business decision. I do not believe that the constitution's debt limitation should be a barrier to sound government or business decisions not involving debt.

The majority opinion should not be read as allowing either the executive or legislative branches to have the ability to contract in excess of constitutionally limited indebtedness without first submitting the debt to public vote.

UTTER and ANDERSEN, JJ., concur with GUY, J.

DORE, C.J. (dissenting)—I dissent. The arrangement proposed by the Department of Ecology to finance its new headquarters violates both the letter and the spirit of article 8, section 1 of the Washington Constitution. Article 8, section 1 limits the amount of debt the State may incur

without a vote of the people. Ecology attempts to disguise the fact that debt ($53 million) is being incurred to finance its headquarters, but its arguments are not persuasive.

## FACTS

This is an original action seeking a writ of mandamus ordering members of the State Finance Committee (the committee) to approve a financing arrangement for Ecology's proposed consolidated headquarters in Lacey. At present, Ecology has its headquarters in 18 separate locations in Thurston County. Ecology plans a 300,000–square–foot headquarters building costing approximately $53 million, and has chosen a 45–acre site on the campus of St. Martin's College. The State, through the Department of General Administration, has entered a purchase option agreement giving it the right to buy the land by January 31, 1991 for a fixed price.

The essential features of the financing arrangement are that, first, the State will exercise its option to purchase the land. To fund this purchase, a bank will pay the acquisition price and hold the property for the State. A trustee will offer for sale certificates of participation (COP's) in the amount of $53 million to purchasers who will obtain the right to receive a share of periodic payments made by Ecology on a "master lease". These payments will return to the COP holders the $53 million over a 20–year period, along with a rate of interest to be determined in the public securities market.

Upon the purchase of the property, several agreements will go into effect, including a 30–year lease of the State's land to the trustee; a sublease of the land from the trustee to a contractor selected by Ecology; an agreement between the contractor and the trustee for the erection of an office building according to Ecology specifications, for a fixed price of $42.5 million; and a 20–year "master lease" of the building to Ecology by the contractor. Upon receipt of payment for the building, the contractor's rights in the ground and master leases will be assigned to the trustee.

Proceeds from the sale of the COP's will be used to repay the bank for the land and to pay the contractor the purchase price of the building upon its completion and acceptance by Ecology.

The master lease includes a nonappropriation provision giving Ecology the right to terminate its payment obligations under the master lease at any time if the Legislature fails to appropriate funding for the lease payments, or if an Executive Order imposes budget cutbacks upon it. Master Lease § 4.1(C). The certificates of participation will include boldface language stating that Ecology's obligation to make payments is "subject to appropriation" by the State Legislature. In other respects, however, Ecology's obligations to make payments "shall be absolute and unconditional," and continue without abatement, for example, in the event of any destruction or damage to the building. Master Lease §§ 6.1–6.2.

If Ecology makes all the payments under the master lease, it will receive full legal title to the building at the end of the 20–year lease period. If Ecology defaults, it must vacate the building, which may then be relet for the benefit of the COP holders.[11] Payments received will be credited to Ecology, and the lease terminated upon full payment of all lease payments. In any event, at the end of the 30–year ground lease, title to the building and any other improvements will vest in the State.

According to the stipulated facts, funds for Ecology's lease payments will come from "several sources", including "legislative appropriation; payments for subleased space . . .; and parking fees." Stipulated fact 32.

---

[11]A potentially significant limitation on the right to relet is contained in the protection provided to COP holders that in the event the interest portion of the "lease payments" by Ecology is exempt from federal income taxation, neither Ecology nor the trustee may obtain a new tenant without "an opinion from nationally recognized bond counsel" that such a lease would not have an adverse impact on such tax exempt status. COP holders will apparently be claiming tax exemption for "interest" paid on "an obligation of a State", I.R.C. §§ 103(a), (c)(1).

On July 16, 1990, Ecology formally requested the State Finance Committee to "approve the form of the proposed Master Lease and Trust Agreement, and to approve appointment of a trustee". Stipulated fact 34. On July 18, the committee declined to approve a submitted resolution endorsing the agreements "because state law has not decisively resolved the constitutional status of this type of financing . . .". Stipulated fact 35.

## GOVERNING LAW

The primary issue in this case is whether the State's proposed financing agreements create debt subject to the limits set forth in article 8, section 1 of the Washington Constitution. The relevant parts of this constitutional provision are as follows.

(b) The aggregate debt contracted by the state shall not exceed that amount for which payments of principal and interest in any fiscal year would require the state to expend more than nine percent of the arithmetic mean of its general state revenues for the three immediately preceding fiscal years . . ..

. . . .

(d) . . . [D]ebt shall be construed to mean borrowed money represented by bonds, notes, or other evidences of indebtedness which are secured by the full faith and credit of the state or are required to be repaid, directly or indirectly, from general state revenues and which are incurred by the state, . . . but shall not include obligations for the payment of current expenses of state government . . ..

. . . .

(g) No money shall be paid from funds in custody of the treasurer with respect to any debt contracted . . . by the Washington state building authority, the capitol committee, or any similar entity existing or operating for similar purposes pursuant to which such entity undertakes to finance or provide a facility for use or occupancy by the state . . ..

To avoid the limits on debt set forth in this constitutional provision, the Legislature passed RCW 39.94.030, effective July 23, 1989. It provides in relevant part:

(1) The state may enter into financing contracts for the use and acquisition for public purposes of real and personal property. Payments under financing contracts shall be made by the

state from currently appropriated funds or funds not constituting "general state revenues" as defined in Article VIII, section 1 of the state Constitution. . . .

. . . .

(4) . . . It is the intent of the legislature that such contracts also shall not constitute a debt or the contracting of indebtedness under Article VIII, section 1 of the state Constitution. . . . It is the intent of the legislature that [certificates of participation in payments to be made under financing contracts] also shall not constitute a debt or the contracting of indebtedness under Article VIII, section 1 of the state Constitution if payment of the certificates is conditioned upon payment by the state under the financing contract with respect to which those certificates relate.

In addition, in 1990, the Legislature passed the following law:

NEW SECTION. Sec. 501. A new section is added to chapter 12, Laws of 1989 1st ex. sess. (uncodified) to read as follows:
(1) The department of ecology may enter into a financial contract in the principal amount of $53,000,000 plus financing costs and required reserves pursuant to chapter 39.94 RCW. This amount is for the acquisition of a Thurston county headquarters site, design, and construction.

Laws of 1990, ch. 299, § 501(1).

ANALYSIS

Ecology argues that the proposed financing arrangement does not constitute debt under article 8 of the Washington Constitution. The basis of this argument is the nonappropriation clause which makes Ecology liable for rental payments only if the Legislature appropriates funds. By this mechanism, Ecology believes it has taken this arrangement outside the constraints of article 8, section 1. I disagree.

I

Although it has been repeatedly repackaged, this is actually the third reincarnation of a lease–purchase scheme to avoid the constraints of the article 8, section 1 debt limitation provisions. I will discuss these events in chronological order. However, a discussion of the history and purpose of our constitutional debt limitation provision is first in order.

The original version of article 8, section 1 was strict and inflexible. It permitted the Legislature to incur debt only to

an aggregate limit of $400,000 unless funding was required to "repel invasion, suppress insurrection, or to defend the state in war". Const. art. 8, § 2. This restrictive provision reflected the attitude of most states at the time that significant controls were necessary to protect the fiscal stability of the state. Nichols, *Debt Limitations and the Bona Fide Long–term Lease With an Option To Purchase: Another Look at Lord Coke,* 9 Urb. Law. 403, 407–09 (1977).

This type of debt limitation provision was first enacted following the financial panic of 1837. After the Erie Canal project proved successful, many states aggressively borrowed to finance similar public projects in the hope of attaining similar prosperity. The optimistic goals were not always realized and the 1837 panic resulted in many states being rendered unable to service their debts. This precipitated an immediate wave of constitutional limitations on the creation of debt. *See* Bowmar, *The Anachronism Called Debt Limitation,* 52 Iowa L. Rev. 863 (1967); Note, *State and Municipal Lease–Purchase Agreements: A Reassessment,* 7 Harv. J.L. & Pub. Pol'y 521 (1984). Unfortunately, most state constitutions did not define "debt," leaving the task to state courts, which have developed a wide variety of tests. Generally, however, "[g]eneral obligation bonds clearly constitute constitutionally restricted 'debt,' while current fiscal operating expenses clearly do not." (Footnotes omitted.) Note, *supra* at 526.

The history of constitutional debt limitation provisions indicates that they were meant by their adopters to be interpreted and applied broadly. The New Mexico Supreme Court recently discussed that state's constitutional debt limitation provision:

> This Court will assume that the framers were familiar with similar constitutional provisions from other states and their judicial interpretation when they drafted the New Mexico Constitution. . . . It is apparent from the cases cited in 1 J. Dillon, *Law of Municipal Corporations,* §§ 193–200 (5th ed. 1911) . . ., that the courts at the turn of the century were familiar with the basic issues involved here. In fact, these constitutional provisions were primarily a response to the heavy

borrowing, and subsequent default, engaged in by many states prior to 1840. . . . Accordingly, indebtedness provisions such as ours were generally given an expansive definition. Dillon writes: "What are debts? In defining these terms it has been declared that the language of the Constitution is exceedingly broad, and should not receive a narrow or strained construction * * * *" . . ..

*Montano v. Gabaldon,* 108 N.M. 94, 95, 766 P.2d 1328, 1329 (1989).

Likewise, Washington's debt limitation provision was not intended to be interpreted narrowly, but rather was meant to create an "impassable barrier" against the creation of debt beyond that provided for in the constitution. *State ex rel. Jones v. McGraw,* 12 Wash. 541, 543, 41 P. 893 (1895). *See also State Capitol Comm'n v. State Bd. of Fin.,* 74 Wash. 15, 132 P. 861 (1913). Delegates at the Washington State Constitutional Convention in 1889 feared the effect on future prosperity if the State was allowed to incur unlimited indebtedness. *See Journal of the Washington State Constitutional Convention, 1889,* Analytical Index, at 667 (B. Rosenow ed. 1962). In *Allen v. Grimes,* 9 Wash. 424, 427, 37 P. 662 (1894), the first case to be decided under Washington's debt limitation provisions, this court stated:

> The object of [article 8] was to insure economy in the management of the state's business affairs by taking away even from the legislature the power to create obligations on behalf of the state which would necessitate taxation to meet them.

With this history in mind, it is understandable why there have been numerous attempts by the State to avoid the constraints of article 8, section 1. Over time, two basic "exceptions" were recognized to the debt limitation provision.

The first was that for state obligations which would be repaid from a "special fund", such as those derived, for example, from the sale of public lands, rather than from general state tax revenues. *Allen v. Grimes, supra; State ex rel. State Capitol Comm. v. Clausen,* 134 Wash. 196, 235 P. 364 (1925). *See also Ajax v. Gregory,* 177 Wash. 465, 32 P.2d 560 (1934) (liquor revolving fund); *State ex rel.*

*Washington Toll Bridge Auth. v. Yelle,* 195 Wash. 636, 82 P.2d 120 (1938) (toll bridge authority funds).

Eventually, however, this court learned through sad experience the result of acceding to the State's desire to obtain ever more ability to borrow funds. In 1949 we ruled that the "special fund" exception could be applied to bonds which were to be repaid by an excise tax on cigarettes. As the majority is inclined to do in this case, we reasoned that "[i]n construing a statute, every reasonable intendment will be indulged in in favor of the construction that it is in conformity with the provisions of the constitution. If a reasonable doubt appears, it should be resolved in favor of the validity of the law". *Gruen v. State Tax Comm'n,* 35 Wn.2d 1, 6, 211 P.2d 651 (1949). The majority in *Gruen* was favorably impressed with the State's argument that other states, such as Oregon, had favored an interpretation of the term "debt" which would exclude any agreement to repay not based on the general credit of the State. *Gruen* explained that "[w]hether there would be a moral obligation to redeem the bonds," in case the excise tax funds were insufficient, "is a matter which does not concern this court. It is sufficient to say there is no legal obligation to do so in the event the special fund is exhausted." 35 Wn.2d at 51. Significantly, it also noted that although "[s]ome fear has been expressed that, with this decision before them, the legislatures of the future will allocate so many of the excise taxes to special purposes that the general fund will be entirely depleted", this was "none of this court's concern, because the state's fiscal policy has been by the constitution delegated to the legislature and not to this court." 35 Wn.2d at 64. In vigorous dissent, Justice Hill predicted that "[i]f this bond issue does not constitute a debt of the state of Washington within the purview of Art. VIII of our constitution . . ., then there is no such thing as effective debt limitation in this state." 35 Wn.2d at 80.

Subsequent history vindicated the dissenters, and provided a telling illustration of the observation of Justice Holmes that "[t]he life of the law has not been logic: it has

been experience." *The Common Law* 1 (1881). In 1963 this court undertook the painful task of overruling *Gruen v. State Tax Comm'n, supra.* "Rising sharply in bold relief from the mists of state financing, this case declared a brave new doctrine in 1949; 14 years later the march of time and events has left us wondering." *State ex rel. State Fin. Comm. v. Martin,* 62 Wn.2d 645, 646, 384 P.2d 833 (1963).

> From the time of its filing . . . *Gruen* marked a turning point in the fiscal procedure of this state. It speedily opened the door to a method of financing urgently needed by the state's rapidly expanding population, a method theretofore thought reserved exclusively to the slower, more cumbersome requirements of a vote of the people. Between *Gruen,* in 1949, and the adjournment of the Extraordinary Session of the 1963 Legislature, nearly two–thirds of a billion dollars in bonds were authorized by successive sessions of the legislature, of which more than one–half billion were actually issued. . . . Only 85 million dollars in bonds were submitted to and approved by a vote of the people. . . . The outstanding bonds, including debt servicing costs, are being retired at about 35 million dollars per year . . ..

*Martin,* at 650–51. As extenuation, the court with the benefit of hindsight noted that

> a single excise on a lone commodity, limited and precise, placed in a special fund for the redemption of bonus bonds, could understandably appeal to the majority of the judges as not constituting a general obligation of the state . . . but the very logic of the holding authorized preemption of portions of the state's general revenues by each succeeding session of the legislature.

*Martin,* at 652. So, on the basis of hard–won experience, the court concluded that

> if the state undertakes or agrees to provide any part of the fund [for repayment of bonds] from any general tax, be it excise or ad valorem, then securities issued upon the credit of the fund are likewise issued upon the credit of the state and are in truth debts of the state.

*Martin,* at 661.

Although suggesting that some of the funds for repayment of the certificate holders will come from subleases of the property itself, the petitioner does not contend that the

lease–purchase arrangement here falls within this exception.

The second generally accepted exception to the debt limitation is for covering "current expenses" of state government. Like the "special fund" exception, it has a reasonable and logical core, which the State now attempts to stretch beyond its intended function. Once more the Legislature, at the urging of representatives of state agencies who have only the most worthy public purposes in mind, believes that it has found the opportunity of a legal loophole in the fabric of the constitutional limitation.

In *State ex rel. Troy v. Yelle,* 36 Wn.2d 192, 217 P.2d 337 (1950), this court held that general fund warrants issued within, and pursuant to, appropriations made by the Legislature for the current biennium, did not fall within the $400,000 constitutional debt limitation then applicable. It was the court's "interpretation that the debt prohibition and limitations of Art. VIII, §§ 1, 2 and 3, were not intended to apply to that class of pecuniary obligations or indebtedness arising out of the ordinary current expenses of maintaining the state government". 36 Wn.2d at 197. Such evidences of obligations to pay for services rendered and materials furnished did not represent "borrowed money", as contemplated by the constitutional limitation. 36 Wn.2d at 195.

Similar interpretations of constitutional debt limitations in other states provided the basic rationale for the developing use of the device of "lease financing" to circumvent such limitations. The theory adopted by a number of courts was that since at common law rent to fall due beyond the current rent period is not a present debt, long–term lease agreements could be funded under the "current operating expenses" exception. *See* Nichols, at 407–09; Magnusson, *Lease–Financing by Municipal Corporations as a Way Around Debt Limitations,* 25 Geo. Wash. L. Rev. 377, 382–83, 388 (1957), and cases cited therein. In this case, however, the entire scheme falls outside the rationale of our

holding in *State ex rel. Troy v. Yelle, supra,* for the purported "lease" payments will be in reality the repayment with state tax funds of "borrowed money", which the State intends will be obtained from the holders of the certificates of participation to be used for the purchase of the land and headquarters building for the Department of Ecology.

This is at least the third time that the State has attempted to use lease–purchase financing to evade the fiscal discipline of debt limitation. It first appeared when the Laws of 1955, 1st Ex. Sess., ch. 12 created the State Building Financing Authority for the sole purpose of acquiring land and constructing buildings for leasing to and eventual acquisition by state agencies. The Authority was authorized to issue bonds to be repaid from lease payments by the agencies. After the lease payments had paid off the principal and interest on the bonds, the State would acquire the property.

In *State ex rel. State Bldg. Fin. Auth. v. Yelle,* 47 Wn.2d 705, 712, 289 P.2d 355 (1955), we acknowledged that

> [t]he state may contract to lease property from private corporations or individuals if the obligations can be met out of current revenues. If it is good business to enter into a long term lease, it may do so.

However, our problem was

> to determine whether this plan is a leasing arrangement, or whether it is the acquisition by purchase of capital improvements, for which the state cannot now pay and payment for which is therefore to be made in annual installments extended over a period of thirty years.

We rejected the argument that this was actually a leasing arrangement, on the ground that

> [i]t is inconceivable that, after paying the rentals . . . for thirty years, the agencies would then pay the true value as a purchase price for the properties, rather than merely a nominal sum. In fact, they will have already paid for their individual buildings.

47 Wn.2d at 713. While we found that the building authority was "actually an agency of the state", the significant fact was that "[i]t is actually the state which is paying the rentals. It is actually the state which is attempting to use

this means of acquiring buildings for its own use." 47 Wn.2d at 713–14.

The issue arose again in 1968, however, when a constitutional amendment was adopted authorizing the creation of a virtually identical financing structure, the Washington building authority. Const. art. 8, § 9. In 1972 this provision was superseded by a constitutional amendment adopted by the voters.

Article 8, section 1 was amended in 1972 for the purpose of giving new life to a constitutional debt limitation that had become "virtually meaningless." Official Voters Pamphlet (1972), at 50. Stipulated fact 56. Stipulated exhibit 6. Numerous exceptions to the $400,000 debt limitation were permitting the Legislature to incur debt without any meaningful limitation: because of the inflexibility of the inelastic debt limitation, the Legislature had aggressively created new types of programs, fund sources, and taxing and financing schemes intended to avoid the constitutional limitation. Voters were told that the proposed amendment would "reduce the interest costs of future bonding and . . . restrict the legislature's ability to incur State debt without the approval of the voters."[12]

A more flexible approach to debt limitation was adopted which had no specific dollar limitation, but instead placed the debt ceiling at a percentage of the State's general state revenues for the three immediately preceding fiscal years. Const. art. 8, § 1(b). This overhaul was an attempt to eliminate the need for the numerous exceptions to the $400,000 limit.

Significantly, revised article 8, section 1(g) prohibits the Treasurer from using state funds to pay debts of the Washington state building authority *or any similar entity which undertakes to finance or provide a facility for use or occupancy by the State or any of its agencies.* The Voters

---

[12]According to the Official Voters Pamphlet, all future bonds would be "backed by the full faith and credit of the State, thereby permitting lower interest rates."

Pamphlet reflected a concern that the issuance of bonds by the building authority could result in an unlimited amount of debt being incurred without a vote of the people. The voters were told that a savings of approximately $50 million in interest costs on future bonds could be anticipated, since future bonds would be "backed by the full faith and credit of the State, thereby permitting lower interest rates."

Now, for the third time, the lease–purchase financing arrangement has resurfaced. I would not issue the writ of mandamus requested by Ecology for a number of reasons. First, the arrangement causes the State to incur debt and must therefore comply with the constitutional limitations of article 8, section 1(b). Second, the arrangement also violates article 8, section 1(g) because it results in the payment of state funds to an entity similar to the Washington state building authority. Finally, the writ of mandamus requested by Ecology should not be granted because the approval or nonapproval of the financing agreement was within the discretion of the state finance committee, and it chose not to approve it.

## II

The first issue in this case is whether the proposed financing arrangement results in the incurrence of "debt" by the State, as that term is used in the constitutional amendment adopted by the voters of this state in 1972.

Although petitioner has cited a number of cases from other jurisdictions applying various technical interpretations to their states' debt limitation provisions, we have noted in an analogous context:

> Such cases are of no value in solving the problem before us. We are not dealing with . . . an accounting concept. Rather, we are here confronted with a constitutional limitation adopted by the people, which is to be understood as their words used in their ordinary meaning and not in any technical sense.

*Automobile Club v. Seattle,* 55 Wn.2d 161, 167, 346 P.2d 695 (1959). Similarly, in *State ex rel. State Capitol Comm'n v. Lister,* 91 Wash. 9, 14, 156 P. 858 (1916), in which this court determined that the state's contractual

obligation to pay interest on bonds from general state tax revenues would constitute "debt" in violation of the constitutional debt limitation, we explained:

> Constitutions being the result of the popular will, the words used therein are to be understood ordinarily in the sense that such words convey to the popular mind. The meaning to be given to the language used in such instruments is that meaning which a man of ordinary prudence and average intelligence and information would give. Generally speaking, the meaning given to words by the learned and technical is not to be given to words appearing in a constitution.

*Lister,* at 14. *See also State ex rel. Albright v. Spokane,* 64 Wn.2d 767, 394 P.2d 231 (1964); Utter, *Freedom and Diversity in a Federal System: Perspectives on State Constitutions and the Washington Declaration of Rights,* 7 U. Puget Sound L. Rev. 491, 510 (1984).

The constitutional definition of "debt" adopted by the voters in 1972 is found in article 8, section 1(d), which defines debt as "borrowed money represented by bonds, notes, or other evidences of indebtedness which are . . . required to be repaid, directly or indirectly, from general state revenues . . .." A commonsense interpretation of this provision requires a holding that the financing arrangement in this case constitutes debt subject to the constitutional limitation.

First, the $53 million to be obtained from certificate holders, which will be repaid by the State under the terms of the "master lease" over the next 20 years, represents, under any commonsense understanding of the term, "borrowed money". *Webster's Third New International Dictionary* 256 (1971) defines "borrow" as "to receive temporarily from another, implying or expressing the intention either of returning the thing received or of giving its equivalent to the lender". The State's intention to repay the funds advanced by the certificate holders, in the form of "lease" payments, with separately designated amortized "principal" and "interest" portions is quite clear.

There is a reason for such clarity. Under the "master lease", the lessor and Ecology declare that they "intend

that the interest portion of the Lease Payments hereunder shall be exempt from federal income tax payable by the Lessor or its assignee(s) . . .. [Ecology] and Lessor each covenant that they will not act or fail to act in a manner which will cause the Lease to be considered obligations not described in Section 103(a) of the Code." In fact, *the* argument for the fiscal attractiveness of such arrangements (other than their ability to circumvent the debt limitation) is that because of this tax break, the government can pay certificate holders lower interest rates than would be included in rents charged by private parties forced to seek private financing.[13]

Section 103(a) of the Internal Revenue Code provides that "gross income does not include interest on any State or local bond." Thereafter section 103(c)(1) defines "bond" as "an obligation of a State or political subdivision thereof."

Prior federal decisions have made it clear that since the purpose of this section is to "permit state and local governments to obtain capital at a low rate of interest", "obligations" in the meaning of this section of the code includes only those "obligations which were created in the exercise of the state's borrowing power." *Fox v. United States,* 397 F.2d 119, 122 (8th Cir. 1968). A true lease–option agreement, as opposed to a conditional sales contract with periodic payments, would *not* qualify for such exemption. *See Cubic Corp. v. United States,* 541 F.2d 829 (1976). Interest portions of such payments must be specifically designated as such. *Kingsford Co. v. Commissioner,* 41 T.C. 646 (1964).

Thus, although in this court petitioner might prefer to argue that it is merely making lease payments, it is precluded from doing so by its ultimate desire to present a case to the federal government (or bond raters), that the

[13]See Brief of Petitioner, at 9 n.7, conceding that because they do not purport to be backed by the full faith and credit of the state, and are subject to the nonappropriation clause, the COP's will require payment of higher interest rates than general obligation bonds. "Nevertheless, the tax–exempt status of the COP's will still allow them to be issued at a lower interest rate than would be charged for development in the private sector."

State has in fact used its borrowing power to obtain the purchase price of this real property, which it is now obligated to repay, at a specified rate of interest.

Second, the certificates constitute evidence of indebtedness. The amount to be financed will effectively be borrowed from those "purchasing" the certificates of participation. The certificates will include the specific schedule for repayment of both principal and interest. The holders of the certificates will be repaid out of the lease payments made by Ecology to the trustee. And, although the certificates will provide that the holders may not be paid if funds are not appropriated, the holders will retain a security interest in the land, the building, and its rental income until the expiration of the 30–year ground lease. This security interest serves one purpose only—the guarantee of repayment should Ecology default or terminate its rental agreement. *The certificates constitute evidence of state indebtedness.*

Moreover, the loan from the holders of the certificates is required to be paid from state revenues. Even though this arrangement has been carefully structured to avoid the appearance of an obligation through the use of the nonappropriation clause, the effort has been unsuccessful. On the surface, it appears that the State's obligation to pay rent will expire if the Legislature fails to appropriate funds, but reading between the lines indicates there is very little likelihood that such an event will ever occur. It is simply not in the best interests of the State to fail to pay rent.[14]

As stated previously, Ecology is currently headquartered at 18 separate locations in Thurston County. There is clearly a dire need for the acquisition of the proposed

---

[14]If this were not so, the risk to potential investors inherent in the nonappropriation clause would presumably send the interest rate above any viable range. *See Credit Policy: Lease Criteria,* Standard and Poor's Credit Week (Apr. 9, 1990). Exhibit 7, at 3, "Essentiality". See also Testimony on House Bill 1794, House Comm. on Capitol Facilities & Financing (Feb. 23, 1989) (tape on file at House Committee).

headquarters. The building is being designed to meet Ecology's short– and long–term needs and there is obviously an intent on Ecology's part to remain in the new building for at least the term of its master lease, *i.e.*, 20 years. The clear purpose of this complex arrangement is to allow Ecology to acquire title to the building and improvements. Ecology will quickly be acquiring equity in the property—$53 million in 20 years. If at any point it defaults on its rent, it will be forced to vacate the premises. The State will lose the use of the premises until the end of the 30–year ground lease period. Should the Legislature ever indicate an unwillingness to appropriate funds for the rental, it will undoubtedly face intense pressure to appropriate.

Furthermore, as noted above, Ecology has agreed to refrain from acting in a manner which would jeopardize the tax–exempt status of the interest payments to the certificate holders. It is not clear how such a result could be accomplished without ensuring that the interest payments would continue to be the "obligations" of the "State"— whether through the Department of Ecology or some other entity.

Thus, although the nonappropriation clause appears to allow the Legislature an escape hatch, that escape hatch is really an illusory one. The debt will be required to be repaid from general state revenues and is thus subject to the limits of article 8, section 1. In *State ex rel. State Bldg. Fin. Auth. v. Yelle, supra,* we quoted *McCutcheon v. State Bldg. Auth.,* 13 N.J. 46, 97 A.2d 663 (1953), *overruled in Enourato v. New Jersey Bldg. Auth.,* 90 N.J. 396, 448 A.2d 449 (1982):

> ". . . The legislation proceeds upon the hypothesis that the fulfillment of the project will not burden the State with a debt or liability within the constitutional sense. But in this the accent is on the external appearance rather than the substance. The label is unimportant; it is not the form but the essence that controls. It is an obvious truism that constitutional limitations may not be set at naught by indirection. . . .
>
> "Thus, the Authority is constituted an instrumentality of the State designed to authorize the construction of building facilities for the use of the State that, if accomplished by the State

directly, would be ineffectual as in excess of the constitutional debt limit, absent the referendum approval of the electorate in consonance with the debt–limitation provision. Such is indubitably the nature of the projects undertaken by the resolution of the Authority now under review—a contrivance to accomplish that which by the same means the State could not do directly. 47 Wn.2d at 710. *See also Montano v. Gabaldon, supra; State ex rel. Nevada Bldg. Auth. v. Hancock,* 468 P.2d 333 (Nev. 1970); *Witzenburger v. State ex rel. Wyoming Comm'ty Dev. Auth.,* 575 P.2d 1100, *reh'g denied,* 577 P.2d 1386 (Wyo. 1978).

We once had to learn from experience that only this court can provide the barriers against the type of "creative financing" which the people so obviously intended to preclude with their vote in 1972. Once again, we are pressured by evidence of dire agency need and clear legislative directive to announce a "brave new doctrine" eviscerating the constitutional debt limitation provision. And once again, although we are asked to rule on one request, the state agencies will be guided by our decision in all their fiscal planning.[15] Will we also, once again, have occasion to look back upon this decision as the end of effective debt limitation in this state?

### III

The proposed financing arrangement also violates article 8, section 1(g) of the Washington Constitution. In 1972 the people clearly indicated their intent to prohibit the payment of any "funds in custody of the treasurer" for the payment of any debt contracted by "the Washington state

---

[15]Taped testimony before the House Capitol Facilities and Financing Committee in reference to House Bill 1794 (Feb. 23, 1989 and Mar. 1, 1989) indicated that although literally millions of dollars in lease–purchase contracts for equipment had been undertaken by various state agencies prior to enactment of RCW 39.94, no agency had ventured to use such a device to purchase real property, or to issue securities comparable to the certificates of participation presented in this case. One representative of the General Administration Department testified that the reason no real estate purchases had been undertaken was "because of the limitations on our authority in the debt limitation question".

building authority, the capitol committee, or any similar entity existing or operating for similar purposes pursuant to which such entity undertakes to finance or provide a facility for use or occupancy by the state" or its agencies.

The majority contends that because in this case a trustee, rather than a specially created state authority, acts to accommodate the State by issuing the certificates evidencing indebtedness, and because the agreements include a nonappropriation clause, this plan is distinguishable from the state building authority.

To the contrary, I believe the current plan is precisely what the voters thought they were preventing. According to the Official Voters Pamphlet,

> pursuant to a constitutional amendment adopted in 1968, an agency known as the state building authority is permitted, without voter approval, to issue bonds without limitation as to amount for the purpose of buying land and/or constructing buildings or other improvements for the state, its agencies, or departments. Such bonds are paid from the operating revenues of the building authority.

This authority would, the voters were informed, be eliminated by the adoption of the proposed amendment.

The essential features of the building authority scheme, as set forth in our opinion in *State ex rel. State Bldg. Fin. Auth. v. Yelle, supra,* are present here: the use of a device styled a "lease" which is in reality a method of making installment payments for the purchase of real estate; the presence of a nominal "lessor" who accommodates the needs of the state agency (here Ecology) for land and office space by selling evidences of indebtedness to the public to raise the needed funds; and contemplated repayment of the bond or certificate holders with appropriated funds of the state agency. For the voters the most telling similarity, of course, would be the lack of any constitutional limit upon the amount of money which the State could seek to raise in this manner.

In the final paragraph of the *Washington State Building Financing Authority* opinion we stated:

> We recognize the housing problem with which the state is confronted. Nevertheless, we can not permit the exigency of the situation to override the constitutional safeguard against improvidence and the integrity of the state's economy. We can not resort to dexterity of judicial thinking in order to assist the state in its problem. We can not close our eyes to what is actually being attempted. When we strip the plan down to fundamentals, we find that it is not a leasing arrangement between landlord and tenant, but the installment purchase by the state of certain buildings and facilities with state moneys raised by taxation, far in excess of the constitutional limitation.

47 Wn.2d at 715. That is the case here as well.

The scheme cannot be saved with the simple device of a nonappropriation clause. As indicated above, voters in 1972 were concerned with more than "binding" future Legislatures. They were concerned as well with the potential drain on the state treasury from payment of higher interest rates than necessary, and with the lack of fiscal discipline on the part of state government. Endorsement of this scheme will frustrate all such hopes.

IV

Even if the proposed financing arrangement were not unconstitutional, a writ of mandamus would not be proper in this case. A writ of mandamus will issue to compel the exercise of discretion, but not to compel the exercise of a particular discretionary decision. *Vangor v. Munro*, 115 Wn.2d 536, 798 P.2d 1151 (1990). The finance committee's decision not to approve the proposed financing arrangement was within its discretion.

RCW 7.16.160 provides that a writ of mandamus may be issued "to compel the performance of an act which the law especially enjoins as a duty resulting from an office, trust or station[.]" Ecology argues that the members of the finance committee had a duty, resulting from the offices they hold, to approve the proposed agreements because RCW 39.94-.040(1) provides that "the state finance committee shall approve the form of all financing contracts[.]" The full text

of the statute reveals a much more substantive role for the committee, however:

(1) Except as provided in RCW 28B.10.022 [refinancing contracts for state higher education institutions], the state may not enter into any financing contract if the aggregate principle amount payable thereunder is greater than an amount to be established from time to time by the state finance committee or participate in a program providing for the issuance of certificates of participation . . . without the prior approval of the state finance committee. Except as provided in RCW 28B.10-.022, the state finance committee shall approve the form of all financing contracts or a standard format for all financing contracts. . . .

. . . .

(3) With the approval of the state finance committee, the state also may enter into agreements with trustees relating to financing contracts and the issuance of certificates of participation.

Although the statute also provides that "[t]he state may not enter into any financing contract for real property without prior approval of the legislature", RCW 39.94-.040(4), there is nothing to suggest that the roles of the Governor, Lieutenant Governor and Treasurer, the members of the state finance committee, are thereby converted to mere ministerial responsibilities.

Clearly what is contemplated by the legislation, and confirmed by the testimony presented to the House Committee on Capitol Facilities and Financing in favor of this legislation in 1989, is that agencies wishing to use "financing contracts" such as the lease–purchase arrangement here are required to obtain state finance committee approval of the form of the contract, among other things, before proceeding, rather than that the state finance committee is ordered to put its "rubber stamp" of approval on proposals brought before it.

"Once officials have exercised their discretion, mandamus does not lie to force them to act in a *particular manner*." (Citations omitted.) *Aripa v. Department of Social & Health Servs.*, 91 Wn.2d 135, 140, 588 P.2d 185 (1978). A writ of mandamus is not appropriately used to order the

state finance committee to put its stamp of approval on the agreements submitted to it in this case.

CONCLUSION

The financing arrangement proposed by Ecology is merely an attempt to circumvent the debt limitation provisions of Const. art. 8, § 1. It will saddle the State with an expensive form of financing in contravention of the expressed will of the people. Furthermore, because of the flexible debt limitation now contained in article 8, section 1, there is no compelling need to attempt to circumvent the debt limitations. The Washington voters have attempted to establish a more meaningful constitutional debt limitation than the original, exception–ridden one. Ecology should not be permitted to thwart these efforts through the creation of a major exception, especially one such as the lease–purchase option which was specifically rejected in the 1972 amendments to article 8, section 1. I would therefore hold that the financing arrangement proposed by Ecology is subject to the debt limitation provisions of article 8, section 1.

If this court would grant the proposed writ of mandamus, undoubtedly every major building of the State in the future would be financed by this "gimmick" method of financing, obligating the Legislature to make appropriations to service certificates of participation, or, in the alternative, on failure to make such appropriations, state agencies would be forced to move out of such new buildings and secure rentals in other offices. If it appropriated such money for a large number of similarly financed buildings, soon the Legislature would exhaust general fund moneys at the expense of children, schools, and the aged, etc. To prevent this, the people passed the 1972 amendments to Const. art. 8, § 1, which the proposed financial gimmick submitted by the petitioners endeavors to eliminate with this scheme.

I predict that when the certificates of participation are offered for sale, in these recession times, that few will buy

them because there are too many "ifs" with the tax exemption.

I believe that the majority owes us an obligation to explain the mechanics of how these certificates would be marketable, and how and when the tax exemption would be secured as well as the approximate interest rate.

The majority should also explain what course would be taken if the trustee can't market the certificates. What then?

I would deny the petition for a writ of mandamus.

BRACHTENBACH and DURHAM, JJ., and CALLOW, J. Pro Tem., concur with DORE, C.J.